Eddie J. CONNER, et al.

v.

MID SOUTH INSURANCE AGENCY, INC., et al.

Civil Action No. 92–0076.

United States District Court,
W.D. Louisiana,
Alexandria Division.

May 10, 1996.

George Bruce Kuehne, Office of Robert C. Schmidt, Baton Rouge, LA, for Eddie J. Conner.

Andrew D. Weinstock, Duplass Zwain & Williams, Metairie, LA, Michael E. Roach, Lake Charles, LA, for Mid South Insurance Agency, Inc., Mid South Insurance Agency, Inc. Employees Thrift Plan, John Postell and Paul G. Zimmerman.

Frederick M. Stoller, Edward P. Gothard, McCloskey Langenstein & Stoller, New Orleans, LA, for Judy Newman.

Andrew D. Weinstock, Lawrence J. Duplass, Duplass Zwain & Williams, Metairie, LA, for Aetna Insurance Co.

### RULING

LITTLE, District Judge.

In our Findings of Fact and Conclusions of Law issued on 14 December 1995, we indicated that an award of attorneys fees to plaintiff was appropriate in this matter pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1132(g). For the reasons stated below, at this time we award $151,830.55 in attorneys fees to plaintiff Eddie Conner.[1]

### I.

The Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* is a comprehensive scheme to regulate numerous issues related to the administration of employee benefit plans. *Ingersoll–Rand v. McClendon*, 498 U.S. 133, 137, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1991). Prominent in this regard is ERISA's " 'carefully integrated' civil enforcement scheme." *Id.* Congress chose to permit private parties to enforce many of the provisions of ERISA, and therefore it provided that in actions by participants, beneficiaries or fiduciaries, successful claimants might recover a "reasonable" attorney fee for their efforts.[2] 29 U.S.C. § 1132(g); *see Chambless v. Masters, Mates & Pilots Pension Plan*, 815 F.2d 869, 872 (2d Cir.1987) ("attorney fee provisions should be liberally construed to protect the statutory purpose of vindicating retirement rights, even when small amounts are involved"). If "a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee," *Blum v. Stenson*, 465 U.S. 886, 901, 104 S.Ct. 1541, 1550, 79 L.Ed.2d 891 (1994), but not a windfall. *See Leroy v. Houston*, 906 F.2d 1068, 1078 (5th Cir.1990).

The Supreme Court has endorsed a two-step process to be used in setting reasonable attorneys fees. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564, 106 S.Ct. 3088, 3097, 92 L.Ed.2d 439 (1986) (*Delaware Valley I* ). The first step is to establish the "lodestar," which is the product of reasonable hours expended on the litigation multiplied by a reasonable hourly rate. *Delaware Valley I*, 478 U.S. at 564, 106 S.Ct. at 3097; *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323–24 (5th Cir.1995), *cert. denied L.K. Comstock & Co., Inc. v. Louisiana Power & Light*, ——— U.S. ———, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995). The lodestar is then presumed to be a reasonable fee. *Delaware Valley I*, 478 U.S. at 565, 106 S.Ct. at 3098. The second step is to consider whether the lodestar should be adjusted upward or downward to take special circumstances into account. *Delaware Valley I*, 478 U.S. at 565,

---

1. Conner's counsel have also submitted a supplement to their original motion. We will address the request to recover 1996 fees when defendants have had an opportunity to review the supplement.

2. In general, the jurisprudence governing a wide variety of statutory attorney fee provisions may be used in interpreting the ERISA provision. *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 562, 106 S.Ct. 3088, 3096, 92 L.Ed.2d 439 (1986).

106 S.Ct. at 3098; *Louisiana Power & Light,* 50 F.3d at 324.

■ We must walk a fine line where federal fee-shifting statutes are concerned. While we do not wish to discourage excellent attorneys from taking the time to prepare properly and present issues in ways that are most helpful to the court, "[a] firm must furnish a reasonable balance between providing adequate legal services and the cost of the same, especially when the client hopes to shift the fee burden." *New York State Teamsters v. DePerno,* 856 F.Supp. 725, 727 (N.D.N.Y. 1994). As required by the Fifth Circuit, we examine each of the items to which opposing counsel objects. *Louisiana Power,* 50 F.3d at 324–26.

## II. The "lodestar"

Four persons or groups of persons did legal work for Eddie Conner in this case: the trial attorney G. Bruce Kuehne, his partner Robert Schmidt, unnamed paralegals/law students/contract attorneys, and a national legal research service. The research service billed a flat rate of $394.23, which this court accepts as reasonable in lieu of objections from defendants. As to the others, plaintiff has allocated hours and requested a different rate for each.

### A. Reasonable hours

Plaintiff's attorneys billed the following number of hours:

| | |
|---|---|
| Robert Schmidt: | 88 hours |
| G. Bruce Kuehne | 967 hours |
| Paralegal/contract: | 67 hours |

Defendants make a number of objections to these proposed hour assignments.

Defendants first argue that plaintiff's attorneys' bills suffer from vagueness, making it difficult to tell how time was spent and how much time was spent on each individual task. The Fifth Circuit frowns on record notations such as "work on brief" or "review for oral argument" as well as consolidating individual items into one large block of time for each day. *Leroy,* 906 F.2d at 1080.

■ Billing specificity is important, but attorneys cannot be required to spend all their time laboring over time descriptions. *Louisiana Power & Light,* 50 F.3d at 327. Again, this is an area where we must walk a fine line between the need make a meaningful review of the billing information and excessive stinginess. Schmidt and Kuehne's bills are arguably guilty of the vagueness criticized in *Leroy,* but we do not adjust their requested hours on that account. Defendants have pointed out several instances of "work on memo" notations, but the general nature of the work done is apparent from context. The firm also consolidated all the time billed for any one day into a total, with an accompanying notation listing all the activities done in one day. This does make evaluating the appropriateness of the time spent on any one project problematic, but we conclude that the daily totals are reasonable.

Defendants also point to several instances of apparently duplicative work by plaintiffs' attorneys. The first type involves G. Bruce Kuehne's work on four of the most important briefs in the litigation. Defendants have calculated the amount of time attributable to each brief.

| Memorandum | Defendants' calculations | As corrected by Plaintiff |
|---|---|---|
| Motion for summary judgment (27 July 1992) | 106.05 | 101.25 |
| Motion for summary judgment (2 February 1994) | 47.25 | 46.75 |
| Pre-trial statements [3] | 86.75 | 77.25 |
| Post-trial memorandum | 88.75 | 88.75 |
| Research (not specified [4]) | 159.00 | 60.75 |
| TOTAL | 487.80 | 374.75 |

■ Happily for the parties and the court, plaintiff developed a theory of the case early in the litigation and stuck with it through two motions for summary judgment and trial. This should have limited the amount of new research needed to prepare legal memoranda

---

3. Apparently, a considerable amount of this time assigned by defendants to this memorandum was in fact spent on other related activities. We cannot distinguish this extra time, because plaintiff's attorneys consolidated all their time for each day into one number.

4. Plaintiff's attorneys provided explanations of each item of research time in their supplemental memorandum.

late in the litigation. The pre-trial and post-trial memoranda, while not absolutely congruent, do bear a striking resemblance to each other. Sentences and even paragraphs were lifted from the earlier document and used in the latter. We are surprised, therefore, that more time was required to prepare the second document than the first. Our Findings of Fact and Conclusions of Law reflect legal theories developed in the pre-trial memorandum, and there are limits to the legal detail for which defendants are required to pay. Thus, we identify 29.5 hours devoted to legal research on the post-trial memorandum by Kuehne and adjust his reasonable hours total by that amount.

■ The other type of duplicative work involves Schmidt's participation in the 5 January 1995 pretrial conference and his preparation for possible trial cross-examination. As for the pretrial conference, both Schmidt and Kuehne attended the conference and billed time for travel; Schmidt billed seven hours for this. Schmidt, a tax expert, also billed fourteen hours to prepare to cross-examine Robert Gani, Mid South's accountant. Nevertheless, Schmidt did not actively participate at trial, and was not present for Gani's testimony. We do not wish to discourage meticulous preparation and performance, but again, there are limits for that which defendants are required to pay. Two attorneys at the pretrial conference is one too many, and Kuehne's trial performance convinces us he was more than capable of cross-examining Gani. We subtract twenty-one from Schmidt's total hours.

■ Defendants' next objection concerns Schmidt & Kuehne's standard billing increment of .25 hours. Obviously, Schmidt and Kuehne may bill as they choose consistent with their clients' wishes and ethical obligations, but defendants should not be required to pay a standard increment for various tasks that may actually take considerably less time. Where plaintiff's attorneys billed .25 hours for a simple phone call, letter draft, or receipt of a document, we adjusted this to .1 hours. Where they billed .5 hours for two

of such activities, we adjusted this to .25 hours. Where the activity was apparently more complex, we did not adjust the amount billed. Thus, Kuehne's reasonable hours should be decreased by 5.15 hours and Schmidt's by one hour.

Defendants finally challenge the amounts of time spent on three documents: a request for oral argument (14.5 hours), a motion for leave to file an amended complaint (17 hours[5]), and this attorney fee application (38.25 hours). Plaintiff's attorneys have explained that the amounts of time defendants cite were devoted to numerous other tasks as well as the identified motions, and this is apparent from the bills. We see no reason for a time adjustment.

Thus, our "reasonable hours" totals are as follows:

| | |
|---|---|
| Schmidt: | 66.00 hours |
| Kuehne: | 932.35 hours |
| Paralegal/ contract: | 67.00 hours. |

### B. Reasonable rate

■ A reasonable rate is the market rate. *Blum*, 465 U.S. at 895–96, 104 S.Ct. at 1547–48. To determine reasonable rates, courts should consider the attorneys' customary rates as well as prevailing rates in the community. *Louisiana Power & Light*, 50 F.3d at 328. The actual amount of fees paid may be useful in determining an appropriate fee award but it is not dispositive. *Id.; see also Blum v. Stenson*, 465 U.S. 886, 895–96, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984).

Plaintiff has requested that we adopt the following as reasonable hourly rates:

| | |
|---|---|
| Schmidt: | $180 |
| Kuehne: | $140 |
| Paralegal/ contract: | $ 40 |

These were Schmidt & Kuehne's rates for new business at the end of the litigation.

What they are not are the rates at which Conner was billed or for which he contracted. They bear no relationship to the opportunity cost of the Conner litigation, because the

---

**5.** We have not found reference to 17 hours of work on this motion and are unclear what defendants mean by this objection.

firm was not accepting new business at those rates through most of the litigation. *See Louisiana Power & Light,* 50 F.3d at 328 (the merit of the established rates is that they reflect the opportunity cost of what the firm turned away in order to take the litigation). During the course of the litigation, Schmidt & Kuehne's billing rates changed. In the early stages, both apparently billed Conner $140/hour.[6] Later, Kuehne's rate decreased to $120/hour and continued to the end of 1995. In the latter months of the litigation, Schmidt's rate increased to $160/ hour.

■ Schmidt & Kuehne's *de facto* fee agreement with Conner also changed over the years. Initially, the attorneys believed this would be a short and simple matter. They contracted for fees of $140/hour for Schmidt, $100/hour for Kuehne, $36/hour for paralegals. They anticipated that the bills would be paid on a timely basis. As the case progressed, it became clear that those expectations would not be met, and the matter effectively changed into a contingency fee case. As a result, the precise contract rates and rates billed are helpful, but not dispositive.

The overwhelming majority of Kuehne's work was appropriately billed at the $120/ hour rate. This reflects his customary rate during the period. Almost all of Schmidt's work occurred at the beginning and the end of this litigation. Near the end of the litigation, Schmidt billed Conner at a $180/hour rate. While this is also the same rate Schmidt was billing new clients, it may not reflect what Schmidt would have charged established clients such as Conner, because Schmidt no longer expected Conner either to pay or object. The rate at which Schmidt billed the remainder of his work in this case, $140/hour, is the reasonable rate for all of his hours.

Defendants suggest that a rate of $92/hour for the attorneys would be reasonable under the circumstances. They attach affidavits

from skilled attorneys familiar to this court, including defendants' trial counsel, indicating that Conner could have obtained competent counsel in this matter for $90/hour.

We preface our remarks on this objection by noting the high level of skill displayed by both plaintiff's and defendants' counsel. On both sides, this case was well litigated, and the quality of the preparation and presentation of law and evidence, particularly in the latter years of this matter, was impressive.

■ Nevertheless, the fact that opposing counsel charged less for his legal services than the attorney for the party seeking a fee award is not grounds to decrease the size of the award requested. *Brantley v. Surles,* 804 F.2d 321, 326 (5th Cir.1986). In this case, there is good reason for the discrepancy in the attorneys' hourly rates. Defendants' counsel and the other attorneys whose affidavits support a $90/hour rate are simply in a different legal services market. Many of their clients are insurance companies. Such clients produce a large volume of work, and attorneys will charge less per hour to attract that volume. They also face little risk of nonpayment.

Plaintiff's counsel represent more individual plans and plan participants. No individual client is likely to produce a large enough volume of work to create economies of scale and professional security. As this matter shows, they are at risk of nonpayment from time to time. *Cf. Brantley,* 804 F.2d at 326 (fact that counsel must be compensated from recovery or award of fees may be considered in making fee award).

As a result, the affidavits submitted by defendants do not establish that those attorneys would have been available to take Conner's case at the $90/hour rate. From their listings in the Martindale–Hubbell Law Directory, it is unclear that these attorneys do ERISA pension work on a regular basis, that they willingly represent plaintiffs, or that they would take work on a *de facto* contingent fee basis. It is also unlikely that they

**6.** Kuehne recorded only a handful of hours in the first year of bills submitted. Since most of these hours were spent in conference with Schmidt or a paralegal, it is difficult to identify his rate for this period. Of course, the relevant rate is that

which he billed when he began doing significant work on the file. In the latter months of 1991, he billed a lower rate, and by the beginning of 1992, he billed his work at $120/hour.

would charge an individual the same rate as a large institutional client from whom they anticipate receiving considerable future business. By contrast, plaintiff's counsel have submitted affidavits attesting to the reasonableness of their fees particularly in light of their professional skill and the legal marketplace in which they participate.

Defendants concede the expertise of plaintiff's counsel, but argue that such expertise was not necessary in this case. They also contend that expertise does not justify higher hourly rates, because it does not automatically decrease the number of hours counsel will bill. *See Leroy,* 906 F.2d at 1079.

We do not agree with defendants that this was a "simple" case. Memorandum in Opposition to Plaintiff's Fee Application, at 6. Like the world-class figure skater who "effortlessly" lands triple axels, a well-prepared and highly skilled attorney can make difficult legal problems seem easy. While some tasks require almost the same amount of time regardless of the attorney's overall ability, at the margin, an attorney with greater expertise in a particular area will have a greater likelihood of success though he bills the same number of hours. That greater likelihood of success can make a difference both to the client's ability to vindicate his ERISA rights as well as developing ERISA law. After all, a discussion of "reasonable rates" for ERISA pension work would have had little meaning to Eddie Conner had he not won his case.

 We conclude that the rates we have set above are reasonable.

### C. Calculating the lodestar

We calculate the lodestar as follows:

| | Schmidt | Kuehne | Paralegal |
|---|---|---|---|
| Reasonable hours | 67 | 932.35 | 67 |
| Reasonable rate | $140/hr. | $120/hr. | $40/hr. |
| Reasonable fee (rate × hours) | $9,380.00 | $111,882.00 | $2,680.00 |

After adding the reasonable fees and the $394.23 fee for the research service, the LODESTAR is $124,336.23.

### III. Adjustments to the lodestar

 The lodestar is presumed to be a reasonable fee, but if there are special circumstances, it may be adjusted upward or downward. *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098. Upward adjustments are rare. *Id.* To determine if an adjustment is appropriate, we consult the factors enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). *See Louisiana Power & Light,* 50 F.3d at 329. They are: (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to perform the legal services; (4) preclusion of other employment by the attorney due to acceptance of the case; (5) the fee customary in the community for similar work; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) amount involved and the results obtained; (9) experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) nature and length of the professional relationship with the client; and (12) awards in similar cases.[7] *Johnson,* 488 F.2d at 717–19.

Defendants' primary argument in favor of adjusting the lodestar downward is based on the amount involved in the case and the results obtained. They point out that in 1992, defendants offered $47,684 to settle the case, $6,000 more than Conner's plan assets.

7. The United States Supreme Court has noted that some of the *Johnson* factors are necessarily subsumed into the computation of the lodestar, such as novelty and complexity of the issues, special skills and expertise of counsel, quality of representation, and results obtained from the litigation. *Delaware Valley I,* 478 U.S. at 565, 106 S.Ct. at 3098. We considered even more in computing the lodestar, because that was how the issues were briefed by defendants. The factors we have already considered are time and labor required, novelty and difficulty of the legal issues, fixed versus contingent fees, customary fees and the skill necessary to perform the services. We consider other factors still to the extent that a downward adjustment is requested pursuant thereto. *See id.* at 565–66, 106 S.Ct. at 3098–99. Plaintiff also makes brief remarks concerning time limitations and expert witness fees. These do not raise the extraordinary circumstances which might induce this court to adjust the lodestar upward.

Plaintiff's settlement offer soon afterwards was for more than $200,000. Defendants claim that plaintiff never seriously attempted to settle the case, and should not receive attorneys fees for the otherwise unnecessary litigation that resulted.

We agree that defendants' 1992 offer might have proved to be fertile soil in which to sow settlement negotiations had the parties known what they know now about the value of the plan assets.[8] The same is true of plaintiffs' 1995 offer for $277,632.25.[9] In fact, neither side appears to have pursued settlement seriously.[10] Plaintiff's failure to accept defendants' 1992 offer and his own inflated offer soon afterwards were based on incorrect third-party appraisals of the plan assets. While it is perhaps regrettable that the 1992 opportunity was lost, we will not adjust the lodestar downward based on this settlement record.

Defendants also claim that while Conner prevailed on almost every issue in the litigation, this was in large measure due to our reliance on the fiduciaries' failure to include a minority discount in the price paid for the stock. Defendants claim this was not an argument put forward by plaintiff's counsel.

Plaintiff's counsel put forth a number of legal theories entitling him to recovery, several of which we found persuasive. Most important were those establishing that defendants had failed to carry their burden of proving the plan paid no more than adequate consideration for Mid South's stock. We ultimately based our findings on the lack of credibility in certain portions of Catherine Oak's testimony, which plaintiff's counsel did much to highlight, as well as the lack of a minority discount in the stock price. Conner's bills indicate that his counsel paid considerable attention to the minority discount issue, and it was sufficiently briefed. More-

over, the court would never have reached the adequate consideration issue had Conner not presented a prima facie case of prohibited transactions, exclusive purpose, and prudence, in some cases exploring uncharted legal waters in the process. Schmidt & Kuehne's representation was by no means incidental to Conner's recovery.

Defendants finally attempt to contrast this situation with awards in similar cases. In particular, they cite *N.Y. Teamsters v. DePerno*, 856 F.Supp. 725 (N.D.N.Y.1994) in which the trial judge awarded only a small attorney fee. Yet, *DePerno* may not be representative. In other cases, the attorney fee recovery has been much larger, even where the legal and procedural complexity of the case was not as great. The trial court in *Nelson v. E.G. & G Energy Measurements Group, Inc.*, 37 F.3d 1384 (9th Cir.1994), awarded attorneys fees of more than $100,000 where the other forms of recovery totaled almost $400,000 on summary judgment. The Tenth Circuit also upheld an award of $17,355.75 in attorneys fees to recover only $12,210 in penalties for failure to provide a summary plan description and other documents in *Moothart v. Bell*, 21 F.3d 1499 (10th Cir.1994). While the ratio of fees to other forms of recovery in this case may turn out to be greater than one, our review of fee-shifting cases shows that it is by no means a statistical outlier.

Plaintiff offers one argument for enhancing the fee award: the "undesirability" of the case. Since this was effectively a contingent fee matter, and there was a genuine risk of nonpayment, plaintiff's counsel claims this case was economically undesirable. The *Johnson* factor, however, focuses more on the personal hardships attorneys may face due to their desire to assist in civil rights and

---

8. Plaintiff lacked information at that time to appraise the plan assets accurately, and therefore mistakenly believed that Conner's plan account contained a much larger sum than it did. Plaintiff claims this lack of information was due to Mid South's recalcitrance in giving sufficient information. It is too late to resolve this dispute. Both parties made strategic mistakes early in the litigation, so it is not completely fair to lay the failure to settle the case in 1992 at plaintiff's door.

9. This turned out to be a high, but not completely unrealistic first offer given the length of the litigation, and therefore, the potential attorney fee award.

10. For example, defendants' final offer on the eve of trial was for $20,000.

other such litigation. *Johnson,* 488 F.2d at 719. Plaintiff has not raised these types of concerns. Moreover, this case was no more economically desirable than any other case brought under a federal statute with a fee-shifting provision. In fact, it is more desirable than garden-variety contingent fee cases where the amount of the fee is predicated on the amount of the recovery.

We are satisfied that our award is appropriate.

## IV. Expenses

Plaintiff has requested attorney expenses as follows:

| | |
|---|---|
| Telephone/fax | $ 699.46 |
| Copies | $ 2,386.31 |
| Postage | $ 349.63 |
| Courier/delivery | $ 322.25 |
| Court reporter | $ 5,870.87 |
| Mileage | $ 269.46 |
| Other travel | $ 660.67 |
| Server/sheriff | $ 195.00 |
| Research (non attorney) | $ 284.00 |
| Expert fees | $16,456.67 |
| TOTAL | $27,494.32 |

Defendants have not objected to these expenses, so we shall include them in the attorney fee award.

## V. Conclusion

The lodestar in this case is $124,-336.23, and it is not subject to adjustment due to the *Johnson* factors. The lodestar plus the expenses equals $151,830.55. For the reasons stated above, this is our attorney fee award.

