120 F.3d 1006
 80 A.F.T.R.2d 97-5594, 97-2 USTC P 50,572,
21 Employee Benefits Cas. 1273,
97 Cal. Daily Op. Serv. 5847,
97 Daily Journal D.A.R. 9429,
Pens. Plan Guide (CCH) P 23935S
 Donna VIZCAINO; Jon R. Waite; Mark Stout; Geoffrey
Culbert; Lesley Stuart; Thomas Morgan;
Elizabeth Spokoiny; Larry Spokoiny,
Plaintiffs-Appellants,
v.
MICROSOFT CORPORATION, and its pension and welfare benefit
plans, et al., Defendants-Appellees.
 No. 94-35770.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 27, 1997.
Decided July 24, 1997.
 
 Stephen K. Strong, David F. Stobaugh, Bendich, Stobaugh & Strong, Seattle, WA, and Charles K. Wiggins, Bainbridge Island, WA, for plaintiffs-appellants.
 James D. Oswald and Timothy St. Clair Smith, Davies, Roberts & Reid, Seattle, WA, for defendants-appellees.
 Ethan Lipsig, Paul, Hastings, Janofsky & Walker, Los Angeles, CA, for amici curiae American Electronics Association, California Chamber of Commerce, California Employment Law Council, and The Employers Group.
 Steven Cherensky, Weil, Gotshal & Manges, Menlo Park, CA, for amici curiae American Payroll Association, Association of Private Pension and Welfare Plans.
 Linda J. Dunn, Office of the Attorney General, Seattle, WA, for amicus Washington State Department of Labor and Industries.
 Appeal from the United States District Court for the Western District of Washington; Carolyn R. Dimmick, District Judge, Presiding. D.C. No. CV-93-00178-CRD.
 Before: HUG, Chief Judge, and BROWNING, FLETCHER, PREGERSON, HALL, O'SCANNLAIN, FERNANDEZ, T.G. NELSON, HAWKINS, TASHIMA, and THOMAS, Circuit Judges.
 Opinion by Judge FERNANDEZ; Partial Concurrence and Partial Dissent by Judge FLETCHER; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN.
 FERNANDEZ, Circuit Judge.
 
 
 1
 Donna Vizcaino, Jon R. Waite, Mark Stout, Geoffrey Culbert, Lesley Stuart, Thomas Morgan, Elizabeth Spokoiny, and Larry Spokoiny brought this action on behalf of themselves and a court-certified class (all are hereafter collectively referred to as "the Workers"). They sued Microsoft Corporation and its various pension and welfare plans, including its Savings Plus Plan (SPP), and sought a determination that they were entitled to participate in the plan benefits because those benefits were available to Microsoft's common law employees. The district court granted summary judgment against the Workers, and they appealed the determinations that they were not entitled to participate in the SPP or in the Employee Stock Purchase Plan (ESPP). We reversed the district court because we decided that the Workers were common law employees who were not properly excluded from participation in those plans. See Vizcaino v. Microsoft Corp., 97 F.3d 1187 (9th Cir.1996) (Vizcaino I ). However, we then decided to rehear the matter en banc, and we now agree with much of the panel's conclusion and reverse the district court.
 
 BACKGROUND
 
 2
 At various times before 1990, Microsoft hired the Workers to perform services for it. They did perform those services over a continuous period, often exceeding two years. They were hired to work on specific projects and performed a number of different functions, such as production editing, proofreading, formatting, indexing, and testing. "Microsoft fully integrated [the Workers] into its workforce: they often worked on teams along with regular employees, sharing the same supervisors, performing identical functions, and working the same core hours. Because Microsoft required that they work on site, they received admittance card keys, office equipment and supplies from the company." Id. at 1190. However, they were not paid for their services through the payroll department, but rather submitted invoices to and were paid through the accounts payable department.
 
 
 3
 Microsoft did not withhold income or Federal Insurance Contribution Act taxes from the Workers' wages, and did not pay the employer's share of the FICA taxes. Moreover, Microsoft did not allow the Workers to participate in the SPP or the ESPP. The Workers did not complain about those arrangements at that time.
 
 
 4
 However, in 1989 and 1990 the Internal Revenue Service examined Microsoft's records and decided that it should have been withholding and paying over taxes because, as a matter of law, the Workers were employees rather than independent contractors. It made that determination by applying common law principles. Microsoft agreed with the IRS and made the necessary corrections for the past by issuing W-2 forms to the Workers and by paying the employer's share of FICA taxes to the government.
 
 
 5
 Microsoft also realized that, because the Workers were employees, at least for tax purposes, it had to change its system. It made no sense to have employees paid through the accounts payable department, so those who remained in essentially the same relationship as before were tendered offers to become acknowledged employees. Others had to discontinue working for Microsoft, but did have the opportunity to go to work for a temporary employment agency, which could then supply temporary Workers to Microsoft on an as-needed basis. Some took advantage of that opportunity, some--like Vizcaino--did not.
 
 
 6
 The Workers then asserted that they were employees of Microsoft and should have had the opportunity of participating in the SPP and the ESPP because those plans were available to all employees who met certain other participation qualifications, which are not relevant to the issues before us. Microsoft disagreed, and the Workers asked the SPP plan administrator to exercise his authority to declare that they were eligible for the benefits. A panel was convened; it ruled that the Workers were not entitled to any benefits from ERISA plans[1]--for example, the SPP--or, for that matter, from non-ERISA plans--for example, the ESPP. That, the administrative panel seemed to say, was because the Workers had agreed that they were independent contractors and because they had waived the right to participate in benefit plans. This action followed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 7
 The district court had jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. §§ 1331 and 1367(a). We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 8
 We review the district court's grant of summary judgment de novo. See Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). However, when reviewing the decision of a plan administrator who has discretion, "the exercise of that discretion is reviewed under the arbitrary or capricious standard, or for abuse of discretion, which comes to the same thing." Snow v. Standard Ins. Co., 87 F.3d 327, 330 (9th Cir.1996); see also Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan, 85 F.3d 455, 458 (9th Cir.1996).
 
 DISCUSSION
 
 9
 Although the Workers challenge both their exclusion from the SPP and their exclusion from the ESPP, the two plans are subject to rather different legal regimes. The former is a 26 U.S.C. § 401(k) plan, which is governed by ERISA; the latter is a 26 U.S.C. § 423 plan, which is not governed by ERISA. It, instead, is governed, at least in large part, by principles arising out of the law of the State of Washington. Nevertheless, certain issues, perhaps the most critical ones, cut across both regimes, and we will address them first.
 
 
 10
 I. GENERAL CONSIDERATIONS.
 
 
 11
 A. The Workers' Status.
 
 
 12
 It is important to recognize that there is no longer any question that the Workers were employees of Microsoft, and not independent contractors. The IRS clearly determined that they were. In theory one could argue that what the IRS said was fine for withholding and FICA purposes, but that is as far as it goes.
 
 
 13
 However, the IRS made its determination based upon the list of factors which is generally used to decide whether a person is an independent contractor or an employee. See 26 C.F.R. § 31.3401(c)-1(b). The same essential definition is used for § 401(k) plans, see 26 C.F.R. § 1.410(b)-9, and for § 423 plans, see 26 C.F.R. §§ 1.423-2(e)(2), 1.421-7(h). That there should be a congruence of approaches is not surprising. As the Supreme Court has pointed out, when Congress uses the word "employee," courts " 'must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning' " of that word. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992). The Court then went on to scrutinize the various typical factors that go into a determination of whether a person is an employee. See id. at 323-24, 112 S.Ct. at 1348-49. Those were the usual common law factors. But, again, we recognize that one could still question the IRS's application of those factors in a particular case.
 
 
 14
 That question is obviated here for, perhaps more to the purpose, both Microsoft and the SPP have conceded for purposes of this appeal that the Workers were common law employees. In fact, they have asserted that the Workers' status is a "nonissue" because they concede that the Workers were common law employees. That is to say, they were employees of Microsoft.
 
 
 15
 B. The Employment Agreements.
 
 
 16
 The concession that the Workers were employees would, at first blush, appear to dispose of this case. It means that for legal purposes they, along with the other employees of Microsoft, were subject to Microsoft's control as to both "the manner and means" of accomplishing their job, that they worked for a substantial period, that they were furnished a workplace and equipment, that they were subject to discharge, and the like. See id.; see also 26 C.F.R. § 31.3401(c)-1(b). If that were all, this would be an exceedingly easy case. Of course, it is not all.
 
 
 17
 Microsoft also entered into special agreements with the Workers, and it is those which complicate matters to some extent. Each of the Workers and Microsoft signed agreements which stated, among other things not relevant here, that the worker was "an Independent Contractor for [Microsoft]," and nothing in the agreement should be construed as creating an "employer-employee relationship." As a result, the worker agreed "to be responsible for all of [his] federal and state taxes, withholding, social security, insurance, and other benefits." At the same time, Microsoft had the Workers sign an information form, which explained: "[A]s an Independent Contractor to Microsoft, you are self employed and are responsible to pay all your own insurance and benefits.... Microsoft ... will not subject your payments to any withholding.... You are not either an employee of Microsoft, or a temporary employee of Microsoft." We now know beyond peradventure that most of this was not, in fact, true because the Workers actually were employees rather than independent contractors. What are we to make of that?
 
 
 18
 We now know that as a matter of law Microsoft hired the Workers to perform their services as employees and that the Workers performed those services. Yet we are also obligated to construe the agreements. See Republic of Nicaragua v. Standard Fruit Co., 937 F.2d 469, 474 (9th Cir.1991); Swanson v. Liquid Air Corp., 118 Wash.2d 512, 521, 826 P.2d 664, 669 (1992). In doing so, we could take either a negative or a positive view of Microsoft's intent and motives. We could decide that Microsoft knew that the Workers were employees, but chose to paste the independent contractor label upon them after making a rather amazing series of decisions to violate the law. Or we could decide that Microsoft mistakenly thought that the Workers were independent contractors and that all else simply seemed to flow from that status.
 
 
 19
 Were we to take the former approach, we would have to determine that Microsoft, with the knowledge that the Workers were simply a group of employees, decided to engage in the following maneuvers:
 
 
 20
 (1) Despite the requirements of federal law that amounts be withheld from employee wages, Microsoft decided it would not withhold. See 26 U.S.C. §§ 3102, 3401-3406.
 
 
 21
 (2) Despite the fact that the SPP states that "employee" means "any common law employee ... who is on the United States payroll of the employer," Microsoft decided to manipulate the availability of that benefit by routing the wages of these employees through the accounts payable department, so that it could argue that they were not on the United States payroll. Beyond that, it also determined that it would tell the IRS in its "Application for Determination for Defined Contribution Plan," that Microsoft did, indeed, basically include all employees, a category that it knew included the Workers, even though it had contrived to exclude them. Beyond even that, Microsoft excluded these employees when it filed its tax returns for the SPP, even though it knew better.
 
 
 22
 (3) Despite the fact that the ESPP must, essentially, be made available to all employees, Microsoft excluded these employees and thereby intentionally risked the possibility that the plan would not qualify for favorable tax treatment. It did that, even though the plan itself stated that it covered all regular employees and that it was to be construed to comply with 26 U.S.C. § 423, a law which basically requires that all employees be covered. The officers of Microsoft also decided to eliminate one group of common law employees from the benefits, even though the board of directors and the shareholders had already made the benefits of the ESPP available to those employees. In doing that, the officers intentionally violated the corporate law of Delaware, to which Microsoft was subject, because the terms of coverage of stock option plans are not in the hands of corporate officers; they are in the hands of the board itself. See Del.Code Ann. tit. 8, § 157; see also Michelson v. Duncan, 386 A.2d 1144, 1150-51 (Del.Ch.1978), aff'd in part and rev'd in part on other grounds, 407 A.2d 211 (Del.1979).
 
 
 23
 On the other hand, in construing the agreements we can view the label as a simple mistake. That is, Microsoft honestly thought that the Workers were independent contractors and took its various actions and inactions based upon that misapprehension. Its actions and the conclusions conveyed to the Workers in the agreements and in the explanation in the information form, which accompanied the agreements, were simply an explication of what the effect of independent contractor status would be and had no separate purpose or effect aside from that explanatory function. That is to say, of course there could neither be withholding from wages nor participation in the benefit plans because those keyed on common law employment status. If the Workers were independent contractors, those would be the inevitable results, even if nothing were said about them in the agreement or the information form. Explaining the meaning of independent contractor status was simply a helpful disclosure.
 
 
 24
 Absent evidence that the officers of Microsoft used their daedalian talents to follow the first route we have just outlined, we must decide that the second route is a more accurate portrayal of what occurred here. In other words, we should, and we do, consider what the parties did in the best light. In so doing, we do not believe that we are being panglossian; we are merely acting in accordance with the ancient maxim which assumes that "the law has been obeyed." See, e.g., Cal. Civ.Code § 3548.
 
 
 25
 The evidence does not undercut our approach; it supports it. As soon as Microsoft realized that the IRS, at least, thought that the Workers were employees, it took steps to correct its error. It put some of them on its United States payroll forthwith. It also gave the Workers retroactive pay for overtime hours. If Microsoft had been withholding taxes while failing to provide benefits, that would have suggested that it knew that the Workers were a species of employee. However, its failure to withhold indicates that it did not think that the Workers were a special breed of employee; it simply thought that they were not employees at all. That was underscored when Microsoft told its managers about the status of the Workers. See Microsoft Manager's Handbook 4.7-4.8 (1988). It distinguished the Workers from other employees, both regular full-time and temporary. It did not say that the Workers were employees in some special category; rather, it said that they were not employees at all. See id.
 
 
 26
 But they were employees, which returns us to the contracts themselves. Viewed in the proper light, it can be seen that the Workers were indeed hired by Microsoft to perform services for it. We know that their services were rendered in their capacities as employees. The contracts indicate, however, that they are independent contractors, which they were not. The other terms of the contracts do not add or subtract from their status or, indeed, impose separate agreements upon them. In effect, the other terms merely warn the Workers about what happens to them if they are independent contractors. Again, those are simply results which hinge on the status determination itself; they are not separate freestanding agreements. Therefore, the Workers were employees, who did not give up or waive their rights to be treated like all other employees under the plans. The Workers performed services for Microsoft under conditions which made them employees. They did sign agreements, which declared that they were independent contractors, but at best that declaration was due to a mutual mistake, and we know that even Microsoft does not now seek to assert that the label made them independent contractors.
 
 
 27
 On the contrary, Microsoft intended that the Workers perform services under the conditions in question, and they agreed to do so. The parties' intentions were in perfect accord in that respect, and the independent contractor label was a mere error. We see no reason to embrace and perpetuate that error. It could be argued that we would have to reform the contracts in order to elide the mutual mistake. Reformation is a concept available under the law of Washington, as it is elsewhere. See Wilson v. Westinghouse Elec. Corp., 85 Wash.2d 78, 84-85, 530 P.2d 298, 301-02 (1975); Denny's Restaurants, Inc. v. Security Union Title Ins. Co., 71 Wash.App. 194, 212, 859 P.2d 619, 629-30 (1993); cf. Scott v. Petett, 63 Wash.App. 50, 57-58, 816 P.2d 1229, 1234-35 (1991). But Microsoft saved us and the Workers the trouble of applying reformation doctrine when it agreed that the Workers were, in fact, not independent contractors. Thus, the label became meaningless, as did the explication of what would follow from that label--no withholding, no benefits.
 
 
 28
 A similar case from the Eleventh Circuit lends support to our conclusion. See Daughtrey v. Honeywell, Inc., 3 F.3d 1488 (11th Cir.1993). In Daughtrey, the plaintiff had gone to work for Honeywell and had signed an agreement which stated that she was an independent contractor, that she was not an employee, and that she was not "entitled to any benefits or privileges provided by HONEYWELL to its employees." Id. at 1490. She later claimed that she was entitled to certain ERISA benefits because she was, in fact, an employee. The district court granted summary judgment against her on the theory that she was actually an independent contractor, but the Eleventh Circuit reversed. It did so because it found the facts to be in dispute on that status issue. It seems apparent that what made her status an issue of material fact was that she would be entitled to "employee benefits for the period during which she performed services as a consultant," if she was an employee. Id. at 1493. Similarly, in this case, other things remaining equal, it would appear that the Workers are entitled to the benefits of all other employees, or, at least, they are not excluded simply because of the contractual terms.
 
 
 29
 One additional matter must detain us for a moment. It could, perhaps, be argued that the statements about benefits, unlike statements about withholding, stand on their own footing as a waiver of benefits, regardless of the Workers' true status as employees. As we have said, we think that would be an incorrect interpretation of these agreements, and Microsoft assured us at argument that this is not a waiver case. Were it one, we would have to consider whether the waivers based, as they would have been, on the mistaken premise of independent contractor status were knowing and voluntary under ERISA and Washington law. See, e.g., Laniok v. Advisory Comm., 935 F.2d 1360, 1367 (2d Cir.1991) (ERISA); Yakima County (West Valley) Fire Protection Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 384, 858 P.2d 245, 252 (1993) (Washington law). Moreover, at least as far as the SPP is concerned, we would have to consider whether the mistaken waiver must and would withstand special scrutiny designed to prevent potential employer or fiduciary abuse. See, e.g., Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 230-31 (2d Cir.1995) (close scrutiny used); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181-82 (1st Cir.1995) (careful scrutiny used); Leavitt v. Northwestern Bell Tel. Co., 921 F.2d 160, 162 (8th Cir.1990) (release reviewed to assure no breach of fiduciary duty); cf. Holt v. Winpisinger, 811 F.2d 1532, 1541 (D.C.Cir.1987) (ERISA vesting provisions cannot be waived); Amaro v. Continental Can Co., 724 F.2d 747, 752 (9th Cir.1984) (ERISA's minimum standards cannot be waived). However, these issues need not even be mooted once it is recognized that there was no separate waiver at all. Moreover, we need not consider what the result would be if the agreements were of a different form or character.
 
 
 30
 In short, Microsoft has already recognized that the Workers were employees and that the "no withholding" consequence of the independent contractor label has fallen; we now hold that the "benefit" consequence has fallen also. Having thus burned off the brumes which threatened to obscure our view, we will now turn to the plans themselves.
 
 
 31
 II. THE PLANS.
 
 
 32
 A. The SPP.
 
 
 33
 The SPP is an ERISA plan. See 29 U.S.C. § 1002(2)(A)(ii); 26 U.S.C. § 401(k); In re Dunn, 988 F.2d 45, 46 (7th Cir.1993). The Workers seek enforcement of the terms of that plan. That is, they seek to have us review the determination of the plan administrator and to require that the plan make its benefits available to them. See 29 U.S.C. § 1132(a)(1)(B). As we have already pointed out, the administrative panel of the SPP determined that the Workers are not entitled to benefits. The reasons appear to have been that the Workers were independent contractors and that they waived the benefits. We must review those determinations to see if they were arbitrary or capricious. See Snow, 87 F.3d at 330. Based upon what we have already said, it is pellucid that they were. To the extent that the decision was based upon the supposed independent contractor status of the Workers, the plan conceded that the decision was wrong when it conceded that the Workers were, in fact, employees. To the extent that the decision was based upon a supposed waiver of benefits, the plan administrator purported to construe the agreements rather than the plan itself. But, as we have pointed out, our construction is the opposite. We, therefore, determine that the reasons given for denying benefits were arbitrary and capricious because they were based upon legal errors which "misconstrued the Plan and applied a wrong standard to a benefits determination." Saffle, 85 F.3d at 461.
 
 
 34
 The SPP now concedes as much, but it and the Workers asked the district court, and ask us, to decide a different issue of plan construction, one on which the administrator has not opined. The district court accepted that invitation, so did the panel. See Vizcaino I, 97 F.3d at 1193. We are tempted to do the same, but upon reflection we have determined that we should not allow ourselves to be seduced into making a decision which belongs to the plan administrator in the first instance.
 
 
 35
 We are asked to decide what is meant by the SPP's restriction of benefits to common law employees who are "on the United States payroll of the employer." The panel explored some of the reasonably possible meanings of that phrase and construed the apparent ambiguity in favor of the Workers. See id. at 1193-96. No doubt the plan administrator should pay careful attention to what was said there. We have also pointed out that we are dubious about the proposition that Microsoft would manipulate plan coverage by assigning recognized common law employees to its accounts payable department or to its payroll department, as it saw fit. We have our doubts that it could properly do so. But it is the terms of the SPP which control, and the plan is separate from Microsoft itself. Thus, we cannot, and will not, predict how the plan administrator, who has the primary duty of construction, will construe the terms of the SPP.
 
 
 36
 We do not know whether he will rely upon an "is" construction--you must actually be on the payroll--or upon an "ought" construction--you must be a person who should be on the payroll. Nor do we know if he will accept the domestic versus foreign gloss on the provision in question. What we do know is that the decision is his in the first instance. We would set a poor precedent were we to intrude upon that exercise of discretion before he has even considered and ruled upon the issue. We would encourage the dumping of difficult and discretionary decisions into the laps of the courts, although one of the very purposes of ERISA is to avoid that kind of complication and delay. Of course, should he rule in favor of the Workers' position, he must then go on to determine what benefits they are entitled to and under what conditions, but that, too, is exactly the kind of decision that he should be making for each of the Workers in the first instance.
 
 
 37
 We are aware of and do not resile from our decision in Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384 (9th Cir.1994). However, that case presented us with a somewhat unusual set of facts. In Nelson the Administrative Committee had not construed the particular provision, but, more than that, an attempt had been made to induce the Committee to rule on the claims, and that request was rejected out of hand. See id. at 1388. Moreover, while the litigation was in progress, the plaintiffs again attempted to induce the Administrative Committee to rule, but that approach was also rebuffed. See id. at 1388-89. Given that recalcitrance, we decided that we would determine the issue ourselves and would decide it de novo because there was no exercise of discretion to defer to. See id. at 1389. That is not this case; this is simply a case where a wholly new issue, which was never put to the SPP administrator, has been raised. He has both the right and the duty to decide it, and we must then review his ultimate decision regarding the Workers by the usual standard. " 'It is not the court's function ab initio to apply the correct standard to [the participant's] claim. That function, under the Plan, is reserved to the Plan administrator.' " Saffle, 85 F.3d at 461 (citation omitted).
 
 
 38
 B. The ESPP.
 
 
 39
 The ESPP was a plan adopted for the purpose of taking advantage of the benefits conferred under 26 U.S.C. § 423. It was approved by the board of directors and by the shareholders of Microsoft. Their action was an offer to employees, as that term is defined in § 423. As we have already suggested, we doubt that the corporate officers set out to withdraw the offer from some employees, even if they could have done that. The Workers knew about the fact of that offer, even if they were not aware of its precise terms. Under the law of the State of Washington, which all agree applies here, a contract can be accepted, even when the employee does not know its precise terms. See Dorward v. ILWU-PMA Pension Plan, 75 Wash.2d 478, 452 P.2d 258 (1969). In Dorward the court pointed out that a pension is not a gratuity, but "rather is deferred compensation for services rendered." Id. at 483, 452 P.2d at 261. We think that that same form of reasoning applies to all employee benefits. Few of them are mere gratuities or a result of unadulterated altruism. Most are for services rendered or for the purpose of inducing the further rendering of services. They help to guarantee a competent and happy labor force. The Washington Supreme Court went on to say:
 
 
 40
 The consideration rendered for the promise in the pension contract of the employer to pay a pension is established when the employee is shown to have knowledge of the pension plan and continues his employment. An enforceable contract will arise in such instances even though the pensioner does not know the precise terms of the pension agreement.
 
 
 41
 Id. Again, we are confident that the court would apply the same reasoning to this employee benefit. Other of its decisions confirm us in our opinion, for it has adopted a protective view toward employees' rights. See Bowles v. Washington Dep't of Retirement Sys., 121 Wash.2d 52, 67-68, 847 P.2d 440, 448 (1993) (pension benefit rights enforced for public employees, even in the absence of specific expectations); Culinary Workers & Bartenders Union No. 596 Health & Welfare Trust v. Gateway Cafe, Inc., 91 Wash.2d 353, 368, 588 P.2d 1334, 1344 (1979) (pension and welfare benefit promises enforced for employees as third-party beneficiaries); Jacoby v. Grays Harbor Chair & Mfg. Co., 77 Wash.2d 911, 915, 468 P.2d 666, 669 (1970) (where employee knows that a pension plan exists, continued employment is consideration).
 
 
 42
 The ESPP was created and offered to all employees, the Workers knew of it, even if they were not aware of its precise terms, and their labor gave them a right to participate in it. Of course, Microsoft's officers would not allow that participation because they were under the misapprehension that the board and the shareholders had not extended the offer to the Workers. That error on the officers' part does not change the fact that there was an offer, which was accepted by the Workers' labor. Of course, the ESPP provides for a somewhat unusual benefit. An employee, who chooses to participate, must pay for any purchase of stock, and the Workers never did that. We, however, leave the determination of an appropriate remedy to the district court.[2]
 
 CONCLUSION
 
 43
 Microsoft, like other advanced employers, makes certain benefits available to all of its employees, who meet minimum conditions of eligibility. For some time, it did not believe that the Workers could partake of certain of those benefits because it thought that they were independent contractors. In that it was mistaken, as it now knows and concedes.
 
 
 44
 The mistake brought Microsoft difficulties with the IRS, but it has resolved those difficulties by making certain payments and by taking other actions. The mistake has also brought it difficulties with the Workers, and the time has come to resolve those.
 
 
 45
 Therefore, we now determine that the reasons for rejecting the Workers' participation in the SPP and the ESPP were invalid. Any remaining issues regarding the rights of a particular worker in the ESPP and his available remedies must be decided by the district court upon remand. However, any remaining issues regarding the right of any or all of the Workers to participate in the SPP must be decided by the plan administrator upon remand.
 
 
 46
 REVERSED and REMANDED to the district court as to the ESPP. REVERSED and REMANDED to the district court for further remand to the plan administrator as to the SPP.
 
 
 47
 FLETCHER, Circuit Judge, with whom HUG, Chief Judge, and PREGERSON, MICHAEL DALY HAWKINS and THOMAS, Circuit Judges, join, concurring in part and dissenting in part:
 
 
 48
 We concur in the substance of Judge Fernandez' opinion except that we would not remand the issue of eligibility to participate in the SPP to the Plan Administrator and would hold that the Workers are eligible to participate. Remand is inappropriate and further unnecessary in that we conclude that interpretation of the phrase "on the United States payroll of the employer" is not required.
 
 
 49
 In its denial of the Workers' claim, the administrative panel convened by the Plan Administrator stated:
 
 
 50
 The denial is affirmed for the reasons that: (1) claimants had agreed and/or acknowledged upon first working for Microsoft that they would not receive employee benefits; (2) claimants specifically waived (by contract) any rights to benefits and (3) even if claimants had been employees and had not "waived rights to benefits," they were not "regular, full-time employees" in an approved headcount position.
 
 
 51
 We agree with Judge Fernandez that these determinations were arbitrary and capricious. On appeal, as Judge Fernandez has also properly noted, the Plan abandoned all of its prior positions in favor of a new tack: that the Workers are not eligible for SPP benefits based on a construction of the phrase "on the United States payroll of the employer." Our disagreement with Judge Fernandez, therefore, concerns (1) whether the Plan can properly raise a theory on judicial review not raised in the administrative process, and (2) if a new theory can be raised, whether the appropriate course is for the court to remand to the Plan Administrator to interpret the phrase in the first instance or for the court to decide the issue de novo. We would hold that the Plan waived any arguments not raised in the administrative process. Second, we conclude that because of their conduct in this litigation the defendants should be estopped from asserting that remand is appropriate. Third, were we to reach the U.S. payroll question, we would conclude that the issue was resolved by the administrative panel's factual determinations. Finally, were we required to interpret the phrase, we would affirm the interpretation of the original three-judge panel of our court.
 
 I.
 
 52
 Remand to the Plan Administrator to determine the meaning of the phrase "on the United States payroll of the employer" is improper because a plan should not be permitted to assert on judicial review reasons for denial that were not contained in the plan administrator's decision. Because it was raised for the first time before the district court, the Plan Administrator waived this argument.
 
 An ERISA plan is required to:
 
 53
 provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant: (1) The specific reason or reasons for the denial; (2) Specific reference to pertinent plan provisions on which the denial is based; (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.
 
 
 54
 29 C.F.R. § 2560.503-1(f).
 
 We recently construed this requirement:
 
 55
 In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters.
 
 
 56
 Booton v. Lockheed Med. Benefit Plan, 110 F.3d 1461, 1463 (9th Cir.1997).
 
 
 57
 These regulations "are designed to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir.1992). The requirements "enable the claimant to prepare adequately for any further administrative review, as well as appeal to the federal courts." Id. (internal quotation marks omitted).
 
 
 58
 In concluding that "no plan can provide discretion to deny benefits for reasons identified only years after the fact," the Seventh Circuit noted that "[t]his Court would emasculate ERISA's disclosure requirement if it were to defer to reasons that the Board first identified on appeal in the District Court, years after the decision at issue." Matuszak v. Torrington Co., 927 F.2d 320, 322-23 (7th Cir.1991).
 
 
 59
 This reasoning is sound. One of the fundamental precepts of appellate analysis is review based on a closed record. To allow a plan to raise new reasons for denial on judicial review could subject the plan participant to a cycle of multiple appeals. It would also effectively eviscerate the requirements of ERISA regulations.
 
 
 60
 In a similar context, we have held that administrative agencies are bound by the reasons stated in their FOIA denial letter and cannot conjure up new reasons on judicial review. Friends of the Coast Fork v. United States Dep't of the Interior, 110 F.3d 53, 55 (9th Cir.1997). Because the Plan may not properly raise the U.S. payroll issue for the first time on judicial review, that issue has been waived and it is improper to remand to the Plan Administrator. Accordingly, because the Plan abandoned its other reasons for denying eligibility, the Workers should be entitled to participate in the SPP.
 
 II.
 
 61
 Even if the U.S. payroll issue can be raised on judicial review, the court should decide the issue de novo rather than remanding to the Plan Administrator. We conclude that through their conduct in the litigation the defendants should be estopped from asserting that the issue is properly before the Administrator in the first instance. The defendants raised their argument that the Workers were not eligible because they were not on the "United States payroll of the employer" for the first time before the district court and urged that court, initially over the objections of the Workers, to decide the issue. The district court obliged. The defendants not only did not object to the district court deciding the question but affirmatively urged it to do so, and the Workers withdrew their objection. The Workers appealed the decision of the district court to this court. Once again, the defendants urged the court to interpret the phrase and to affirm the district court. The original panel did so but reversed the ruling of the district court and held for the Workers. Only then, after losing on the merits on appeal, in their petition for rehearing and suggestion for rehearing en banc, do the defendants for the first time argue that we should remand the question of the interpretation of the phrase "on the United States payroll of the employer" to the Plan Administrator if we are unwilling to affirm the district court. The defendants make this argument despite their failure to raise the issue during the administrative process, despite their sua sponte raising the issue and urging that it be decided by the district court, and despite their urging that this court reach the issue on appeal. After proceeding through four years of litigation urging at every turn that the issue be decided by the court, the defendants should be estopped from asserting otherwise. See Voliva v. Seafarers Pension Plan, 858 F.2d 195, 197 (4th Cir.1988) ("the party who introduced new evidence in the district court ... cannot argue that the district court was foreclosed from considering the Plan's alternative argument").
 
 
 62
 Even today the defendants are willing to have us interpret the phrase, but only if we defer to the Administrator. The defendants contend that their willingness to have the court decide the issue all along was contingent upon the court giving deference to their interpretation of the phrase because they represent the Plan. This argument is specious. Although we defer to the reasonable interpretations of a plan administrator when the plan grants the administrator discretion to construe its provisions, see Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S.Ct. 948, 954-55, 103 L.Ed.2d 80 (1989), we do not grant the same discretion to the position taken by a plan as litigant. Where a plan administrator has not exercised his discretion to construe a provision in a plan, our review is de novo. Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384, 1389 (9th Cir.1994) (de novo interpretation of plan is appropriate when, although administrative committee had discretion to do so, it failed to interpret the plan after repeated requests from participants). When conducting de novo review we "construe [the terms of a plan] without deferring to either party's interpretation." Firestone, 489 U.S at 112, 109 S.Ct. at 955.
 
 III.
 
 63
 Were we to reach the U.S. payroll issue on de novo review, we would hold that the Workers are eligible to participate in the SPP. The case can be resolved without interpreting the Plan language. A careful review of the record before the administrative panel convened by the Plan Administrator reveals that while the administrative panel had no occasion to construe the U.S. payroll language, it did find that the Workers had been "recharacterized, for payroll purposes only, ... as 'employee[s].' " (Emphasis added.) The administrative panel described this recharacterization as follows: "The effect of the IRS's recharacterization is that individuals who had worked in recharacterized positions were issued W-2 forms and they became eligible to refile their income tax returns for the relevant years as 'employees' rather than as 'independent contractors.' "
 
 
 64
 Because the administrative panel's determination is supported by ample evidence in the record, we should accept its factual determination that the Workers were placed on the payroll of the employer, albeit retroactively, for the relevant period. Snow v. Standard Ins. Co., 87 F.3d 327, 331 (9th Cir.1996) (reviewing courts must accept the factual determinations of the administrator unless they are clearly erroneous). In light of the administrative panel's finding of fact that the Workers were on the payroll, they are eligible under the SPP regardless of how the "on the United States payroll" phrase is construed. If, as the Workers suggest, the phrase refers to those employees who are United States residents paid from United States sources, then the Workers would be eligible to participate in the Plan. Alternatively, if the defendants' construction is correct and the phrase limits benefits to those employees who were "on the payroll," then the Workers also prevail. The pleadings establish that the Workers were all United States residents and worked in the United States, and the administrative decision established that they were reclassified as employees on the payroll of the employer. Therefore, under either interpretation the Workers are eligible to participate in the SPP.
 
 IV.
 
 65
 Finally, were we called upon to interpret the phrase we would agree with the conclusion of the original three-judge panel of our court that the Workers are "on the United States payroll of the employer" for substantially the same reasons advanced by the panel. Vizcaino v. Microsoft, 97 F.3d 1187, 1196 (9th Cir.1996).
 
 
 66
 Accordingly, we respectfully dissent from the decision to remand this aspect of the appeal back to the Plan Administrator.
 
 
 67
 O'SCANNLAIN, Circuit Judge, joined by CYNTHIA HOLCOMB HALL and T.G. NELSON, Circuit Judges, concurring in part and dissenting in part:
 
 
 68
 I respectfully dissent from all but Part II-A of the court's opinion because Microsoft and the plaintiffs never formed a valid contract under Washington law for the benefits now claimed. I concur in the result of Part II-A of the court's opinion but not in its analysis.
 
 
 69
 * I do not disagree with the court's statement of facts, but it has failed to mention some and may leave a mistaken impression of others. Thus, I suggest that the following additional facts from the record be taken into account.
 
 
 70
 The plaintiffs were temporary "freelancers" for Microsoft. Instead of calling them by this label-which was ubiquitously used within the Microsoft community and by the plaintiffs themselves-the court styles the plaintiffs as "workers." It then engages in a long discussion of why they were in fact "common law employees" of Microsoft. Both labels may be true-the plaintiffs did work, and Microsoft has conceded that the plaintiffs satisfy the definition of common law employees for some purposes. Neither of these labels are relevant to the question before us, however, and both are potentially misleading. Both labels imply that the plaintiffs were just like any other regular Microsoft employees, and hence should be eligible for the same benefits as regular staff. The evidence in the record, however, points to the contrary. I will refer to the plaintiffs by the same term the plaintiffs themselves use "freelancers".
 
 
 71
 Before going further, it is also important that the statement of facts identify precisely what period of activity is at issue in this case. All plaintiffs were hired before 1989. In the fall of that year, the IRS determined, for employment tax purposes, that the freelancers were common law employees. After that, in late 1989 and during 1990, Microsoft directly hired some of the freelancers as "staff"[1] (with Microsoft benefits) and arranged for the remainder to become employees of unrelated employment agencies (without Microsoft benefits) who had contracts with Microsoft.[2] For the sake of clarity, I note that all we decide today is whether the freelancers should have been allowed to participate in the ESPP and the SPP during the period leading up to the 1989-90 conversion. All agree that those freelancers who were converted into employees of outside employment agencies have no valid claim for participation in the ESPP and SPP after the date of their conversion.
 
 
 72
 When the freelancers were originally retained by contract with Microsoft, they were expressly told that they were not eligible for any Microsoft employee benefits, and that they would have to provide their own benefits. Indeed, the named plaintiffs admit that they did not think they were entitled to benefits, and did not think benefits were a part of their compensation package.
 
 
 73
 Moreover, the freelancers each signed contractual documents which expressly stated that they would not receive any benefits, and would have to pay their own taxes and benefits. Specifically, Microsoft required that each plaintiff sign an "Independent Contractor Agreement" ("ICA"). I think it is appropriate to set out the complete text of the relevant ICA provision:
 
 
 74
 CONTRACTOR is an independent contractor for MS [Microsoft]. Nothing in this Agreement shall be construed as creating an employer-employee relationship, or as a guarantee of a future offer of employment. CONTRACTOR further agrees to be responsible for all federal and state taxes, withholding, social security, insurance and other benefits.
 
 
 75
 Attached to the ICA was a one-page document entitled "independent contractor/freelancer information," which the freelancers also signed. It stated:
 
 
 76
 [A]s an Independent Contractor to Microsoft, you are self-employed and are responsible to pay all your own insurance and benefits.
 
 
 77
 In the district court, Microsoft's uncontested extrinsic evidence established that the plaintiffs were told, and knew, that benefits were not a part of their compensation. Instead of providing benefits, Microsoft paid the freelancers at a higher hourly rate than Microsoft's regular employees. The freelancers were also treated differently in a host of other ways. They had different color employee badges, different e-mail addresses, and were not invited to company parties and functions. Instead of receiving a regular paycheck from Microsoft's Payroll department (like Microsoft's regular employees), freelancers submitted invoices for their services to the Accounts Payable department.
 
 
 78
 With these additional relevant facts in mind, we may consider the merits.
 
 II
 
 79
 As I see it, this is a simple contracts case. The Washington law of contracts governs the freelancers' claim of entitlement to benefits under the Employee Stock Purchase Plan ("ESPP"). No law, state or federal, mandates that Microsoft provide such benefits even to its employees. Plaintiffs are eligible to participate in the ESPP only to the extent that they entered into a valid contract with Microsoft for such participation.
 
 
 80
 Offer, acceptance, and consideration are requisites to contract formation under Washington law. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984). In order to be entitled to benefits under the ESPP, therefore, Microsoft must have offered the benefits to the freelancers, and the freelancers must have accepted that offer.
 
 
 81
 The court claims that Microsoft's board of directors offered ESPP benefits to the freelancers when they promulgated the ESPP, reasoning that an offer of benefits in a pension plan extends to and may be accepted by employees who do not know its precise terms, as long as they generally know of its existence, citing Dorward v. ILWU-PMA Pension Plan, 75 Wash.2d 478, 452 P.2d 258, 261 (1969). The ESPP is not a pension plan, however, and, therefore, standard principles of contract law govern. Even so, as a matter of contract law, Dorward might have supported the result in this case if Microsoft's board had merely promulgated the ESPP and the freelancers, knowing of its existence, satisfied the ESPP's eligibility requirements. But in a line of general employment law cases apparently ignored by the court's opinion, Washington courts have held that an employer revokes a generally promulgated offer when it enters into a specific agreement with an employee which is inconsistent with the offer. Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081, 1087 (1984); Hill v. J.C. Penney, Inc., 70 Wash.App. 225, 852 P.2d 1111, 1117 (1993); Grimes v. Allied Stores Corp., 53 Wash.App. 554, 768 P.2d 528, 529-30 (1989); see also Swanson v. Liquid Air Corp., 118 Wash.2d 512, 826 P.2d 664, 672 (1992) ("It is generally recognized that an employer can disclaim what might otherwise appear to be enforceable promises in handbooks or manuals or similar documents."). As a matter of standard contract law, that principle is unassailable: an offer can be revoked by giving specific notice to the offeree at any time prior to acceptance or substantial performance. Collins v. Morgan Grain Co., 16 F.2d 253, 255 (9th Cir.1926), cited with approval in 1 Arthur L. Corbin & Joseph M. Perillo, Corbin on Contracts, § 2.18, at 217 n. 7 (rev. ed.1993). And, after all, the Washington Supreme Court has clearly proclaimed that the traditional requisites of contract formation apply with full force to modern, unilateral employment contracts. Thompson, 685 P.2d at 1087.
 
 
 82
 Exactly such a revocation occurred here. Microsoft's board offered the ESPP to employees generally, and then Microsoft told the freelancers: "We aren't offering the ESPP to you; ESPP benefits are not included in your contract." Knowing that they wouldn't get ESPP benefits, the freelancers nevertheless agreed to work for Microsoft. Their contract therefore does not include ESPP benefits because the offer of those benefits was revoked.
 
 
 83
 Likewise, there was no mutual assent (or "meeting of the minds") as is required for the formation of a unilateral contract. See Multicare Medical Center v. State, 114 Wash.2d 572, 790 P.2d 124, 132-33 (1990). Microsoft did not think it was offering ESPP benefits to the freelancers, and the freelancers did not think they were accepting an offer of ESPP benefits. Had the parties known that a court would force them to include ESPP benefits in their contract, the bargain undoubtedly would have been different.
 
 
 84
 If this is not enough, the court's alleged contract suffers from another defect: a lack of consideration. There was no detrimental reliance on the ESPP by the freelancers-they did not think they would get ESPP benefits, and they still chose to work for Microsoft on Microsoft's terms. Indeed, it is hard to imagine what consideration the freelancers could have given for the ESPP benefits since they chose to work for Microsoft for several years without benefits. If anything, the freelancers received consideration (a higher hourly rate) for their agreement that they would not get ESPP benefits.
 
 
 85
 The court conjures up two reasons to disregard the express and unambiguous revocation of the offer of benefits to the workers, and to find a contract for benefits where none exists. First, the court says, the statements in the employment contracts were the result of a mistake since Microsoft's officers incorrectly thought the freelancers were independent contractors. The statements were not meant to have independent legal significance, but were "simply a helpful disclosure" explaining the meaning of independent contractor status-a status, it later turns out, that the freelancers did not have. I am unpersuaded.
 
 
 86
 The court makes this simple contracts case unnecessarily complicated, obfuscating the obvious meaning of the agreements. When one sets the ESPP side-by-side with the agreement signed by the freelancers, one realizes that no brumes obscure the court's view of a solution to its manufactured mistake; it vainly scans the horizon for a solution which is sitting right under its nose. Microsoft drafted the ESPP and the agreements using the same terminology ("employee") to ensure there could be no mistaking that ESPP benefits were not part of the bargain. The signed agreements say: "Nothing in this Agreement shall be construed as creating an employer-employee relationship.... CONTRACTOR further agrees to be responsible for all ... benefits." These provisions are not simply a "helpful disclosure." Quite the contrary, the agreement says "CONTRACTOR further agrees ...." How much clearer could it be that this is an independent, legally binding part of the bargain? By "burning off" this inconvenient contract language, the court may as well have set fire to the contracts themselves.
 
 
 87
 To top it off, Washington courts have already rejected the court's reasoning. In Daniel v. Pacific Northwest Bell Telephone Co., 20 Wash.App. 444, 580 P.2d 652, 654 (1978), a worker signed a written agreement with the telephone company stating that he was an independent contractor, although under the common law definition, the worker was in fact an employee. The Washington court ruled that the common law definition was inapposite:
 
 
 88
 It is well settled that one is bound by the contract which he voluntarily and knowingly signs. It has been said that "the whole panoply of contract law rests on ... [that] principle ..." National Bank of Washington v. Equity Investors, 81 Wash.2d 886, 912-13 [506 P.2d 20] (1973). For 18 years, the contract under which Mr. Daniel performed his work declared that he was an independent contractor. He does not claim that he did not understand the meaning of that term, nor does he contend that the contracts were the result of overreaching or fraud by the telephone company. In these circumstances, the characterization of Mr. Daniel's employment as that of an independent contractor is binding as between Mr. Daniel and the telephone company.
 
 
 89
 Id. This court's discussion of common law employees and mutual mistakes should be seen for what it is--a smokescreen which both confuses and conceals. Regardless of whether Microsoft and the freelancers were mistaken about the freelancers' employment status, their agreement stands on its own and ought to be enforced according to its terms.
 
 
 90
 The court's second argument, albeit not fully developed, is that under Delaware's corporations law, Microsoft's officers did not have authority to modify or to revoke the offer of the ESPP made by Microsoft's board of directors. There are two problems with this analysis.
 
 
 91
 First, as an entity without a physical existence, Microsoft can only act through its agents. Conklin Bros., Inc. v. United States, 986 F.2d 315, 318 (9th Cir.1993). Under Delaware's corporations law, however, the board of directors directs the affairs of the business but is not an agent of the corporation. Arnold v. Society for Savings Bancorp, Inc., 678 A.2d 533, 539-40 (Del.1996); see also Restatement (Second) of Agency § 14C (1958) ("Neither the board of directors nor an individual director of a business is, as such, an agent of the corporation or of its members."). The only way to enter into a contract with Microsoft, therefore, was through Microsoft's officers and employees as agents of the corporation. It may be that the officers and employees did not have the actual authority to make a "no ESPP benefits" offer to the freelancers. They certainly had the apparent authority to strike such a bargain, however. In any event, under standard principles of agency law, if the principal ratifies unauthorized acts of its agent, the ratification relates back to the time of the acts and is equivalent to original authority. Hannigan v. Italo Petroleum Corp., 47 A.2d 169, 172 (Del.1945). By accepting the freelancers' performance under the contract, and by choosing to defend against the freelancers' claim from 1990 until now, Microsoft's board of directors, and Microsoft itself, has impliedly ratified the "no ESPP benefits" offer. See id. Delaware law is therefore no obstacle to a contract for no ESPP benefits.
 
 
 92
 Second, even if the officers did not have the actual authority under Delaware corporations law to make a "no ESPP benefits" offer to the freelancers, the contract formed by the freelancers' acceptance of the offer exists nonetheless. The "no benefits" provision is an important term of the overall contract and should not be treated apart from the bargain as a whole. The freelancers cannot, with perfect hindsight, pick and choose among the parts of the contract they want to enforce while discarding the provisions they don't like, premised upon the notion that the officers lacked authority to form the contract. Furthermore, a contrary ruling undermines Delaware's carefully crafted rule that only the corporation (or a shareholder suing derivatively) can seek a remedy for unauthorized acts of corporate officers. See Dieter v. Prime Computer, Inc., 681 A.2d 1068, 1072 (Del.Ch.1996).[3]III
 
 
 93
 The freelancers also claim that Microsoft should have allowed them to participate in its Savings Plus Plan ("SPP"), which is governed by ERISA. The SPP provides that "[e]ach employee who is 18 years of age or older and who has been employed for six months shall be eligible to participate in this Plan." It then defines "employee" as "any common law employee who receives remuneration for personal services rendered to the employer and who is on the United States payroll of the employer." The freelancers argue that they fit this definition of employee; Microsoft retorts that the freelancers were not "on the United States payroll of the employer." Our first task, therefore, is ascertaining what that phrase means.
 
 
 94
 We cannot immediately set about this task, however, because the SPP grants discretion to the plan administrator to construe the plan. The Supreme Court has instructed us that when the plan vests discretion in the administrator, principles of trust law require that we leave the plan administrator's interpretation undisturbed if reasonable. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111, 109 S.Ct. 948, 954-55, 103 L.Ed.2d 80 (1989). Indeed, ERISA encourages plan fiduciaries to exercise properly the discretion they have been granted; courts should not be second-guessing the discretionary decisions of fiduciaries without a very good reason. Thus, we are not to impose our view of a provision on the plan, but are confined to reviewing the administrator's construction to determine whether it is reasonable.
 
 
 95
 In order for this rule protecting a plan administrator's discretion to be meaningful, however, the administrator must be given an opportunity to interpret the meaning of plan provisions before the court rules. In this case, the plan administrator did not overtly construe the phrase "on the United States payroll of the employer," at least so far as I can tell from the record. The district court believed that the administrator impliedly rested its decision on a particular interpretation of that phrase. Although there is a colorable argument in support of the district court's belief, I believe that the judicially stated preference that the plan administrator interpret the plan, subject to a limited review by courts, requires us to remand to the plan administrator explicitly to construe the meaning of that phrase. I agree with the court's conclusion on this point.[4]
 
 
 96
 I write separately to clarify that I do not concur in the court's analysis of the meaning and implications of "on the United States payroll of the employer," and, as dicta, the court's statements do not bind the plan administrator in any way. In my view, that phrase is a term of art with significance within the Microsoft community. Further, I do not agree with the ill-advised suggestion that Microsoft might not have been able properly to classify employees for participation or non-participation in an ERISA plan based on whether the employees were regular hires paid through the Payroll department or "freelancers" paid through the Accounts Payable department. Microsoft could choose to offer the SPP to whichever classes of employees it wishes. It is certainly free to decide not to offer positions satisfying the SPP's criteria to these plaintiffs.
 
 
 97
 I respectfully concur in the result of Part II-A of the court's opinion but otherwise dissent.
 
 
 
 [1]
 See Employee Retirement Income Security Act of 1974, Pub.L. No. 93-406, 88 Stat. 829 (1974)
 
 
 [2]
 We fully agree with the panel's disposition of Microsoft's asthenic claim that the Workers are attempting to remedy a violation of § 423 itself; we need not repeat the panel's discussion here. See Vizcaino I, 97 F.3d at 1197
 
 
 [1]
 "Staff" was the term Microsoft and the plaintiffs use for regular employees
 
 
 [2]
 As the court's opinion notes, a few of the freelancers refused to accept jobs with outside employment agencies. As a result, their relationship with Microsoft ceased altogether
 
 
 [3]
 Similarly, that the board's ratification might have adverse tax consequences for the ESPP does not allow us to ignore the overwhelming evidence that the officers and the board did not offer ESPP participation to the freelancers
 
 
 [4]
 Judge Fletcher contends that a remand is inappropriate because (1) the Plan has waived any claim that the provision might bar benefits for the freelancers by not interpreting the Plan provision in the first instance, and (2) the Plan is estopped from arguing for a remand
 With respect, her first argument overlooks the fact that the Plan Administrator had no need to reach the question of the meaning of "on the United States payroll" since it had already determined that the freelancers were not entitled to benefits on several other grounds. I am not persuaded that by failing to interpret expressly a provision in the Plan the Administrator rendered the provision a nullity. Moreover, Judge Fletcher reads this concurrence and dissent too broadly; it does not hold that the Plan or Microsoft should prevail on the merits of an argument never raised before, but only that the Plan Administrator should be given an opportunity to construe a phrase it thought unnecessary to reach.
 Judge Fletcher's second argument misapprehends, in my view, the nature of our review in this case. It is not a question of whether the Plan or Microsoft wishes us to decide the question or to remand it; a party cannot, by waiver or estoppel, change the applicable standard of review. Principles of trust law and ERISA limit our review of the Plan Administrator's discretion. We must give the Administrator an opportunity to exercise that discretion by remanding the case. Our conclusion has nothing to do with whether Microsoft urges us to decide the merits.