Melvin A. NELSON; Wayne
F. Schnepple, Plaintiffs–
Appellees,

v.

**EG & G ENERGY MEASUREMENTS
GROUP, INC., Defendant–
Appellant.**

No. 93–55740.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1994.

Decided Oct. 7, 1994.

---

Brendan Dolan, Brobeck, Phlegar & Harrison, San Francisco, CA, for defendant-appellant.

Marcus E. Crahan, Jr., Crahan, Javelera, Ver Halen & Aull, Los Angeles, CA, for plaintiffs-appellees.

Before: HUG, WIGGINS, and NOONAN, Circuit Judges.

HUG, Circuit Judge:

This is a class action brought on behalf of 44 employees ("plaintiffs") of EG & G Energy Measurements Group, Inc. ("EG & G"), who took an early retirement option offered by EG & G. The plaintiffs were participants in a savings plan established by EG & G for its employees and filed this action in state court for damages pursuant to section 501(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). EG & G removed the case to federal court. The major issue in the case is the correct valuation date for the individual accounts of the plaintiffs upon the termination of their employment. The plaintiffs contend that the correct date was September 30, 1987, prior to the stock market crash on October 19, 1987, whereas EG & G maintains it was October 30, 1987, after the crash. The district court granted summary judgment for the plaintiffs, which EG & G appeals. EG & G also contests the calculation of pre-judgment interest and the award of attorneys' fees. We affirm the judgment of the district court.

Jurisdiction in the district court was based on 29 U.S.C. § 1132(e)(1). Jurisdiction on appeal is based on 29 U.S.C. § 1291.

## I.

EG & G is a federal government contractor involved in the nuclear weapons development and testing program. Due to imminent budget reductions, EG & G offered to approximately 200 to 250 employees the option of voluntary early retirement. Between 110 and 120 employees elected early retirement and, as required, terminated their employment with EG & G effective September 30, 1987, the end of EG & G's fiscal year. The plaintiffs represented in this class action are 44 of those former EG & G employees who elected voluntary early retirement.

EG & G maintained an IRS-qualified 401K Savings Plan ("Savings Plan") designed to encourage its employees to invest in long-term savings accounts and thereby accumulate retirement funds. The Savings Plan assets were divided into two types of funds. Fund A is a capital preservation fund with a guaranteed rate of interest; Fund B is a long-term growth fund in which the assets are invested in equity and fixed income securities. Fund B guarantees no rate of return, and the investments are subject to the fluctuations of the stock market. EG & G employees had the option of investing in either Fund A, Fund B, or a combination of the two; plaintiffs in the present case participated in both plans. Participation in the Savings Plan was completely voluntary; contributions to the Plan were effectuated through payroll deductions. EG & G also made annual employer contributions on a matching basis equal to 50% of an employee's contribution up to 6% of the employee's total compensation.

During the relevant time period, Savings Plan assets were maintained by Boston Trust Safe Deposit and Trust Company, Inc. ("Boston Trust" or "Trustee"). As Trustee, Boston Trust processed contributions to the Savings Plan and calculated the value of Savings Plan assets. Savings Plan contributions were deducted from each participant's weekly paycheck, and the cumulative total contributions were subsequently forwarded to Boston Trust by wire. Payroll information concerning each plan participant's contribution was also forwarded to Boston Trust. The Savings Plan was formulated by a formal document ("Plan") and a summary of the plan ("Summary") that was given to all of the employees. A trust agreement established the relationship between EG & G and Boston Trust. A section of the Savings Plan provides that the Plan is to be construed and enforced under ERISA and Massachusetts state law.

The final working day for the early retiring employees was September 30, 1987. Payroll checks for each retiring employee were prepared and dated September 28, 1987, reflecting earnings through September 30, 1987. All deductions and accruals, including contributions to the Savings Plan, as well as accrued and unused vacation and sick leave and other amounts that may have been due to or owing from the employee were reflected in these final payroll checks. The payroll checks were distributed to the employees on September 30, 1987, along with

the usual check stub showing the final accruals and deductions. Under the terms of the Plan, the plaintiffs were entitled to have distributed to them in a lump sum, the amount reflected in their accounts as of the "Valuation Date." This distribution is required to be made within a reasonable time, but not later than 60 days after the end of the plan year in which the employment is terminated.

Section 2.44 of the Plan provides:

"Valuation Date" means that last working day of each calendar month or the day on which a special valuation is made at the request of the Administrative Committee or the Trustee[s].

The parties agree that no special request was made by the Administrative Committee or the Trustee, thus the operative phrase is "the last working day of each calendar month." The plaintiffs contend that "the last working day of [the] calendar month" for them was September 30, 1987, the date they terminated their employment and received their final payroll checks. EG & G contends that October 30, 1987, was the last working day of the calendar month because the plaintiffs' final deducted contributions were not sent to the Trustee until October. EG & G argues that the normal practice it followed was to transmit by wire to the Trustee the total employee contributions to the Savings Plan at the end of each weekly payroll period. The wire transmission was sent either on the day of, or the day after, the payroll checks were delivered. This was followed with a computer tape showing the amount deducted for each employee for the Savings Plan.

From the information provided by EG & G, the Trustee made the valuation calculations for each month, allocating the month's earnings proportionately to each account. September 30, 1987 fell between a normal weekly payroll period. EG & G's position is that the appropriate valuation date is the end of the month when the last weekly employee contributions are forwarded to the Trustee. During the month of September, the last regular weekly payroll period for which employee contributions were forwarded to the

Trustee ended September 20, with the contributions having been forwarded on that day or the day after.

Although the paychecks were delivered to the plaintiffs on September 30, 1987, the amount of their employee contributions were not forwarded to the Trustee until the regular weekly payroll checks were delivered to all employees on October 7, 1987. Thus, EG & G determined that the valuation date for the plaintiffs' accounts was the last working day in October.

The Trustee furnished to all employees a quarterly valuation report showing the account valuation for each employee as of the last working day of the final month of the quarter, September 30, 1987. Although the plaintiffs received the valuation of their individual Savings Plan accounts as of September 30, 1987, which included the September 30, 1987 contributions, the payments of the balances of the plaintiffs' accounts were based upon an October 30, 1987 valuation. This made a considerable difference to many of the plaintiffs.[1]

On cross motions for summary judgment, the district court entered summary judgment for the plaintiffs and awarded damages in the amount of $269,474.23, representing the decrease in value of the plaintiffs' accounts between the September 30 and October 30 valuation dates. In addition, the district court awarded pre-judgment interest in the amount of $107,823.32, and attorneys' fees and costs totalling $101,129.38.

## II.

We review a grant of summary judgment *de novo* and must therefore determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court applied the relevant substance of law. *Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). In this case, the material facts are essentially undisputed. The real question presented is whether the district court

---

1. For example, Nelson's September 30 valuation was $125,101.68, and the October 30 valuation was $110,793.61, a difference of $14,308.07. Schnepple's September 30 valuation was $220,400.13, and the October 30 valuation was $192,930.79, a difference of $27,469.34.

correctly applied the substantive law to these undisputed facts.

In reviewing the interpretation of the terms of a benefit plan, the Supreme Court has held that "a denial of benefits challenged under section 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). If such discretion is given to an administrator or fiduciary and that discretion is exercised pursuant to the terms of the plan, then the decision of the administrator or fiduciary is reviewed under an abuse of discretion standard. The Supreme Court in *Firestone* noted that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Id.* (citation and internal quotations omitted). In this case, no conflict of interest is asserted.

■ EG & G contends that the abuse of discretion standard is the appropriate standard for review in this case because authority is given under the terms of the Plan to an Administrative Committee to interpret the Plan. Section 9.4 of the Plan provides:

> 9.4 The Administrative Committee may from time to time establish rules and procedures for the administration of the Plan. All rules, procedures and decisions of the Administrative Committee shall be uniformly and consistently applied to all Participants in similar circumstances. Such rules, procedures and decisions so made shall be conclusive and binding on all persons having an interest in the Plan.

The provisions establishing the Administrative Committee and specifying its method of operation provide in part:

> 9.1 The Plan shall be administered by an Administrative Committee of not less than three members, to be appointed by and serve at the pleasure of the EG & G, Inc. Board of Directors.

> 9.3 A majority of the members of the Administrative Committee at the time in office shall constitute a quorum for the transaction of business. All resolutions or other action taken by the Administrative Committee shall be by the vote of the majority of the Administrative Committee present at any meeting or by instrument in writing signed by a majority of the members of the Administrative Committee without a meeting.

The record reveals that no action was ever taken by the Administrative Committee interpreting the valuation date as set forth in section 2.44 of the Plan or interpreting its application to the particular circumstances of these retiring employees. Although an interpretation of the Plan could have been sought from the Administrative Committee by the employees of EG & G that performed the administrative functions, such was never done. No regulation or further resolution amplifying or interpreting section 2.44 was ever made by the Administrative Committee; thus, no discretion was exercised by the body given that authority under the terms of the Plan.

EG & G also contends that the plaintiffs were required to bring their valuation claims before the Administrative Committee prior to seeking relief from the courts. Nothing in the Plan requires such action prior to instituting suit. Furthermore, the plaintiffs point out that such action would have been futile because the attempt of class member Les Hunt to obtain relief from the Administrative Committee was rejected. That request was answered by Joan Thiffault, the Pension Administrator, and was not referred to the Administrative Committee for ruling or interpretation. In response to Hunt's request, Thiffault's letter stated:

> Although your termination was September 30, 1987, your final contribution to the Plan through payroll was in the first week of October. Unfortunately, this means that you (along with all the other EG & G Energy Measurements' early retirees) were subject to the October valuation.

In addition, the plaintiffs sought, after commencement of this litigation, to obtain a ruling from the Administrative Committee, but

that approach was rebuffed by the attorneys for EG & G.

Thus, because we do not have an interpretation of the Plan by the Administrative Committee, to whom such authority was granted by the Plan, there is no appropriate exercise of discretion to which to defer. The Plan does not permit the exercise of discretion by an employee who happens to be involved in the administration of the Plan, but rather that discretion is to be exercised by an Administrative Committee appointed by the Board of Directors in a formal manner by resolution or in an instrument signed by a majority of the members of the committee. Therefore, under the provisions of *Firestone,* we interpret the terms of the Plan *de novo* by looking at the terms of the Plan, the summary statement given to the employees, and other manifestations of the parties' intent.

### III.

■ The crux of this case requires us to determine the appropriate valuation date to be applied to these retiring employees under the terms of the Plan. We look first to the terms of the Plan itself. The key provision is section 2.44, which we quote again for convenient reference:

> "Valuation Date" means that last working day of each calendar month or the day on which a special valuation is made at the request of the Administrative Committee or the Trustee[s].

It would be reasonable to interpret this provision to mean that the last working day of the month in which an employee terminates his employment and receives his final paycheck would be the appropriate month-end valuation date for that employee. However, this is not the only possible interpretation.

The Summary of the Plan given by EG & G to its employees provides further evidence of the intended meaning of that provision of the Plan. The Summary provides:

FUND VALUATION AND AMOUNT DISTRIBUTABLE

Both your employee and Company accounts will be valued at the end of each calendar month. The Administrative Committee can request the Trustee to perform a special valuation at any time if unusual circumstances exist. In the event you make a withdrawal or terminate, your employee and Company accounts will be valued at the end of the month in which the withdrawal is made and the withdrawal will be processed as the first transaction of the following month. In the event you terminate during the calendar year due to death, retirement, or disability, you will be eligible to receive a Company contribution in that year based upon the contributions you made during the calendar year and which were still in your account on the date of your termination.

The key sentence is "[i]n the event you make a withdrawal or terminate, your employee and Company accounts will be valued at the end of the month in which the withdrawal is made and the withdrawal will be processed as the first transaction of the following month." Thus, the employees were told that in the event they terminated their employment, their accounts would be valued at the end of the month in which the "withdrawal" is made. The meaning of the word "withdrawal" is therefore important in this context.

It is obvious that "withdrawal" cannot mean withdrawal of funds from the Plan by payment from the Trustee. The valuation of the account must necessarily be made before the Trustee could pay the employee. Furthermore, the Summary states that the "withdrawal will be processed" the following month. Thus it is apparent the valuation takes place before any processing or payment. When an employee terminates his employment with EG & G, he may no longer participate in the Plan and is required to withdraw all the funds in his account. As of September 30, 1987, the plaintiffs had filled out the required withdrawal forms, had terminated their employment, and had received their final paychecks. The withdrawal was completed; it only remained to be processed. There is nothing in the Summary that indicates that the valuation is to await the transmission of the contributions to the Trustee or any other processing. To the contrary, the Summary states the valuation is to precede

the processing. Thus, from the standpoint of the language of the Summary, the term "withdrawal" for terminating employees is the last day of employment when the final paychecks are issued.

EG & G contends that the appropriate date for valuation is the end of the month in which the regular weekly payroll is processed, the checks are issued to all employees, and the contribution for all employees is sent to the Trustee. As to continuing employees, this makes sense because those employees have not had any contribution withheld from them until they received their regular payroll checks. It is at that time that the employer holds a portion of their earnings. The contribution is then sent to the Trustee that same day or the day after. For terminating employees, however, the contribution to the Savings Plan has been withheld from them on the date when they are issued their final paychecks. At that time, the employer retains funds of the employees that are rightfully a part of the Savings Plan.

EG & G utilizes a "Savings Plan Withdrawal Form" to process withdrawals from the Savings Plan. Section G of that form provides:

> G. TO BE COMPLETED BY YOUR PAYROLL DEPARTMENT BEFORE SENDING IN THIS FORM. DATE ON LAST PAYROLL CHECK DEDUCTION __/__/__ (Complete for termination or Stop Contribution only).

The payroll departments in some locations filled in the date "9/30/87" for the retiring employees, while the payroll departments in other locations filled in the date "10/7/87" for the retiring employees.

The affidavits of Charles Rohan, the EG & G benefits administrator responsible for day-to-day administration of the Savings Plan, and Margerie Dever–Connors, the Record keeping Project Manager for Boston Trust, who was responsible for the participant rec-

ord keeping for the Savings Plan, both state that section G of the Withdrawal Form is used to determine the month-end valuation.

The date of the *last payroll check deduction* on this form is to be filled out by the employer. It is clear that the date of the last payroll check deduction from these terminating employees was on September 30, 1987. If the form had been filled out correctly, it should have shown 9/30/87, as some of the forms did, and the valuation would then have been made as of that date. No provision in the Plan, or in the Summary, or on the Withdrawal Form utilized by EG & G, indicates that the valuation date is to be when the final contribution is sent into the Trustee. In fact, the Summary makes it quite clear that the processing takes place after the valuation. Section G of the Withdrawal Form, which provides the valuation date to be utilized by the Trustee for the payment to terminating employees, specifies that the date of the last payroll check is the date to be provided by the employer.

It makes sense that when the employees are paid they receive their money and the employer receives the deducted amount in trust with the responsibility to transmit that amount to the Trustees for the Savings Plan. At the time of the deduction from the employees, EG & G not only possesses the funds of the employees, but also has full knowledge of the amount of the employee contributions. This is evidenced by the fact that the funds can be transmitted by wire that same day.

EG & G relies upon a regulation promulgated by the Department of Labor that provides when employee contributions are to be considered assets of a benefit plan. Regulation, 29 C.F.R. § 2510.3–102, which became effective August 15, 1988, provides as follows: [2]

> (a) *Participant Contributions.* For purposes of subtitle A and parts 1 and 4 of subtitle B of title I of ERISA and section

---

**2.** The plaintiffs contend that the regulation is inapplicable because it was not in effect at the time of the plaintiffs' termination of employment. The plaintiffs contend that the law prior to the regulation would require that the contributions be considered a part of the Savings Plan on the date that they were deducted from the employees' final paycheck. We need not consider whether the regulation has retroactive application because even applying that regulation, we conclude that the correct valuation date was September 30, 1987.

4975 of the Internal Revenue Code ... the assets of the plan include ... amounts that a participant has withheld from his wages by an employer, for contribution to the plan as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets, not to exceed 90 days from ... the date on which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages).

Section (b) of the regulation gives two examples: one in which an employer has certain requirements in which reasonable segregation is somewhat delayed, and a second in which it is.the practice of an employer only to issue a check to the trustee of the plan once every quarter. In the latter circumstance, it is determined that the reasonable period was 10 days after the close of the pay period and, thus, the employee contributions were considered to be plan assets at that time even though the check was not transmitted to the Trustee until sometime later.

In this case, it is clear that EG & G could reasonably segregate the amounts due to these retiring employees on the date the employees terminated and their final paychecks were issued. As a matter of fact, these checks were cut on September 28, 1987, and the amount was known at that time. Furthermore, the record is clear that the funds were often wired to the Trustee on the date that the weekly payroll checks were issued to the employees. Even if we consider this Department of Labor regulation to apply retroactively to 1987, the employee contributions should have. been considered plan assets at the time they could reasonably have been segregated, which was September 30, 1987.

We agree with the district court that the correct valuation date for the Savings Plan accounts of the plaintiffs was September 30, 1987, and the amounts due to them from that valuation should have been paid. The wording of the Plan, the Summary provided to the employees, and the Withdrawal Form utilized by EG & G all point to this interpretation. This is consistent with the Department of Labor regulation because the earliest date

the amount of the contributions could reasonably be segregated for these retiring employees was the date that the final payroll checks were distributed to the employees and the deduction for the contribution taken by EG & G. The incorrect valuation date furnished to the Trustee by EG & G damaged the plaintiffs to the extent of the difference between the September 30, 1987 valuation and the October 30, 1987 valuation of their accounts.

## IV.

EG & G argues that the district court erred in calculating the pre-judgment interest awarded to the plaintiffs. We have held that the interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest "unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate." *Western Pacific Fisheries, Inc. v. S.S. President Grant,* 730 F.2d 1280, 1289 (9th Cir. 1984). Here, the judge made no findings that a different rate was justified. Section 1961 provides that the post-judgment interest rate shall be equal to "the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." 28 U.S.C. § 1961.

EG & G argues that the pre-judgment interest rate should have been calculated at the 52–week Treasury bill rate as of the time of judgment, which was 3.51 percent. This does not correspond with the approach taken in *Western Pacific Fisheries.* In that case, insurance underwriters had paid out funds for which they sought reimbursement. The interest rate utilized for the pre-judgment interest was the average 52–week Treasury bill rate operative immediately prior to the date of payment by the underwriters. This makes good sense because pre-judgment interest is intended to cover the lost investment potential of funds to which the plaintiff was entitled, from the time of entitlement to the date of judgment. It is the Treasury bill rate during this interim that is

pertinent, not the Treasury bill rate at the time of judgment. The Treasury bill rate at the time of judgment has no bearing on what could have been earned prior to judgment.

The method of calculating the pre-judgment interest utilized by the district court reasonably reflected this approach. The interest due was calculated as though the plaintiffs had invested the withheld funds at the 52–week Treasury bill rate and then reinvested the proceeds annually at the new rate.[3] This reasonably reflects the conservative investment income the plaintiffs would have been able to have earned had they received the funds on September 30, 1987. We affirm the district court's calculation of pre-judgment interest.

### V.

EG & G challenges the district court's award of attorneys' fees to the plaintiffs in the amount of $101,129.38. The statute commits the allowance of attorneys' fees to the discretion of the district court, 29 U.S.C. § 1132(g), therefore, we review for abuse of discretion. *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 452 (9th Cir.1980).

ERISA, like the Civil Rights Acts of 1871 and 1964, and the Labor–Management Reporting and Disclosure Act, is remedial legislation which should be liberally construed in favor of protection participants in employee benefits plans. Section 502(g)(1), 29 U.S.C. § 1132(g)(1), authorizes the court to award attorney fees. This section should be read broadly to mean that a plan participant or beneficiary, if he prevails in his suit under § 1132 to enforce his rights under his plan, should ordinarily recover an attorney's fee unless

special circumstances would render such an award unjust.

As in cases involving section 1988 awards, a district court considering a motion for attorney's fees under ERISA should apply discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts. As a general rule, ERISA employee plaintiffs should be entitled to a reasonable attorney's fee if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.

*Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1985) (citations and internal quotations omitted).

■ In the case at hand, the plaintiffs prevailed completely on the sole issue in question, received the entire relief sought, and resolved a significant legal question regarding the valuation date for persons retiring or terminating their employment. When this result is evident from the order of the district court, it is unnecessary for the court to engage in a discussion of the factors enumerated in *Hummell,* 634 F.2d at 453. The district court did not abuse its discretion in its decision to award attorneys' fees to the plaintiffs.

EG & G also challenges the amount of the award. It did not take issue with the hourly rates of the attorneys involved, but challenged whether the time spent was reasonable. The district judge considered EG & G's arguments and we conclude from our review of the record that he did not abuse his discretion in determining the amount of the attorneys' fees.

---

**3.** The annual Treasury bill rate utilized was the average during each year rather than the rate at the beginning of each year. The latter would have presented a slightly more accurate reflection of a 52–week Treasury bill investment as of September 30, 1987, and an annual reinvestment of the funds. The method chosen results in a slightly reduced rate for all but one year and a lesser return for the entire period, thus resulting in no prejudice to the defendants. The comparison is as follows:

| YEAR | AVERAGE DURING YEAR | BEGINNING OF YEAR |
| --- | --- | --- |
| 1987 | 7.36% | 7.88% |
| 1988 | 8.75% | 8.04% |
| 1989 | 8.02% | 8.15% |
| 1990 | 6.42% | 7.78% |
| 1991 | 4.42% | 5.17% |

## VI.

### CONCLUSION

The district court correctly concluded that the appropriate valuation date for the plaintiffs' Savings Plan accounts was September 30, 1987, and its calculation of damages, prejudgment interest, and the award of attorneys' fees was proper.

**AFFIRMED.**