**Gloria ARCHULETA, Plaintiff,**

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY, et al., Defendants.**

**No. EDCV06–00811SGLOPX.**

United States District Court, C.D. California.

Aug. 15, 2007.

Glenn R. Kantor, Corinne Chandler, Kantor and Kantor, Northridge, CA, for Plaintiff.

Kevin P. McNamara, Harrington Foxx Dubrow & Canter, Los Angeles, CA, for Defendants.

## ORDER ON ADMINISTRATIVE REVIEW

LARSON, District Judge.

This matter is before the Court on administrative review. This action arises out of plaintiff's appeal of the defendant insurer's termination of long-term disability ("LTD") benefits. The Court has reviewed the parties' briefs and the administrator record. As explained herein, the administrator abused its discretion in terminating plaintiff's benefits, and plaintiff is entitled to benefits under the Plan.

### I. Administrative Record

The internal claims file of the insurer, filed with the Court as the "Administrative Record," reveals the following:

On August 2, 2003, plaintiff stopped working due to back pain, and on October 24, 2003, she filed a claim form with defendant stating that she was unable to work because she was unable to sit for long periods of time without experiencing pain. AR 350. On his part of the claim form, plaintiff's physician noted that plaintiff had an impingement of the spinal cord at T8, that she could not stand, walk, or drive, and that she could sit only one to three hours. AR 647. Shortly thereafter, plaintiff began receiving LTD benefits.

On April 21, 2004, plaintiff underwent discectomy, and on May 12, 2004, her surgeon reported to her physicians that he was "pleased to say [plaintiff] has no neurological or spine symptoms." AR 518.

On November 17, 2004, plaintiff's benefits were terminated. AR 121. The letter referred to the surgeon's report noted above, and office visit notes from Dr. Schneider from August, 2004, which did not document any ongoing impairment.

AR 122. Therefore, defendant concluded, plaintiff's medical records did not support a finding of total disability beyond the usual post-operative period, which ended July 15, 2004. AR 123.

On December 10, 2004, plaintiff requested review of the decision to terminate her benefits. AR 118. In her letter requesting review, plaintiff stated:

Please note that I have not yet recovered and my pain still continues. My physician has placed me on the following medications (Vicodin, Ultracet, Nortriptylin, Lipitor and Levoxyl) .... Please note that I am under continuous medications which could also effect my ability to do my job.

AR 118. With her appeal letter, plaintiff included a letter from her physician, Dr. Mark D. Schneider, dated November 30, 2004, which states that plaintiff "is still totally disabled and her condition is ongoing." AR 119. The letter asks that Dr. Schneider be contacted should the reader have any questions. AR 119.

Additional evidence was gathered by defendant. On December 17, 2004, Dr. Liceaga, a medical doctor and "pain management consultant" provided a report that noted severe back and arm pain, stiffness, and decrease in range of motion. AR 493. Plaintiff's medications were noted to be anti-inflammatories, Hydrocodone, Ultracet, and Nortriptylene. AR 493. He made a number of recommendations, including that plaintiff have physical therapy, a repeat MRI, changes in medication, and that plaintiff receive a number of injections of medications. AR 495.

Defendant requested that plaintiff's physician, Dr. Mark Schneider, and Dr. Liceaga complete a physical capacities assessment form. AR 499; 503. Both did so in January, 2005, indicating as follows that during "an 8-hour workday" plaintiff

could, "on a regular basis" perform the following activities:

| Dr. Schneider | Dr. Liceaga |
|---|---|
| Frequent sitting (34%–66% of the time); occasional standing (less than 33% of the time); frequent walking (34%–66% of the time); frequent reaching at desk level (34%–66% of the time); occasional reaching at mid chest level (less than 33% of the time); sedentary lifting (10 pounds, occasionally). | Frequent sitting (34%–66% of the time); frequent standing (34%–66% of the time); occasional walking (less than 33% of the time); occasional reaching at desk level (less than 33% of the time); no reaching at mid chest level ("not at all"); sedentary lifting (10 pounds, occasionally). |

AR 500–501; 504–505.

The doctors each noted that plaintiff still suffered back pain. AR 501 ("Post-thoracic surgical pain and scarring."); AR 505 ("She has persistent back pain at T7–10 radiating to right upper quadrant of abdomen.").

By letter dated February 3, 2005, defendant notified plaintiff that her benefits were being reinstated. AR 99.

On March 9, 2005, defendant received a vocational report from vocational consultant Beth S. Darman. The report recounted the author's interview with plaintiff, wherein plaintiff informed the author that her pain medication made her sleepy and that she was taking morphine. AR 381–382.

Defendant's file contains an "Internal Claim Summary/Management Plan," dated June 10, 2005, which recommended terminating the claim as of October 31, 2005: "Per [vocational report] dtd 2/2/05, several alternative occupations were identified based on the claimant's [restrictions and limitations] of sedentary with position change." AR 273.

Defendant notified plaintiff of this decision by letter dated June 21, 2005. AR 80–84. The defendant concluded that plaintiff was not disabled from "any occupation" and therefore sent a check representing benefits due through the end of the "own occupation" clause, October 31, 2005. The letter notes that the termi-

nation of benefits is based on three factors: First, the letter detailed plaintiff's physicians' assessment during the time period of August 1, 2003, through December 17, 2004. AR 81–82. Second, the letter refers to Dr. Liceaga's physical capacities assessment, about which defendant states "per the completed questionnaire, your physician indicated that you are capable of performing a sedentary occupation with the ability to change position," AR 82. And third, the letter refers to the vocational report that concluded that plaintiff could be able to perform the positions of "Data Entry Clerk, Receptionist; Insurance Clerk, Information Clerk, Hospital Admitting Clerk, Payroll Clerk, Service Clerk, and Wire Transfer Clerk." AR 82.

A second vocational report by Beth Darman, this one dated July 15, 2005, is also found in the claims file. An interview with plaintiff revealed the following information: "She is not taking as much medication and she finds the OxyContin takes the edge off her pain, but it makes her 'fuzzy headed' and she is not able to drive very far at this time." AR 369.

Neurology consultation notes dated August 23, 2005, reveal the use of the following medication: Levoxyl, Nortriptyline, Norco, Tramadol, Zonegran, Lipitor, and morphine. AR 57.

Dr. Schneider's September 2, 2005, notes state that plaintiff's "pain [is] under

control but [she] cannot do sedentary work."[1]

On November 10, 2005, plaintiff appealed the termination of her benefits that was effective as of October 31, 2005. AR 21. She stated:

My condition has not improved and has actually gotten worse.

.    .    .    .    .

I am currently still unable to sit or stand for more than 10–15 minutes at any given time. I am on the following medications on a daily basis, which effects my concentration of being able to focus on anything.

Morphine Sulfate 15 mg 3 × daily

Tramadol 50 mg 4 × daily

Norco 325 mg every 6—8 hours

Nortripyline 25mg 2 × daily

Ambien 10mg at bedtime.

AR 21.

Plaintiff also questions Dr. Liceaga's ability to assess her physical capacities because he had seen her only twice and did not have her medical chart when he was filling out the form. AR 21.

On December 8, 2005, Dr. Schneider filled out a more detailed form, apparently provided to him by plaintiff. AR 477–483. There, he stated that plaintiff's prognosis was "fair," that her lumbar range of motion was diminished, that she had constant burning, sharp, tingling pain at T7–9, that her symptoms and functional limitations were consistent with her physical impairments, that plaintiff had not had complete pain relief with medication without unacceptable side effects, that she could sit only two hours in an eight-hour day, that she could stand or walk no more than one hour a day during a five day work week,

that she should not sit continuously in a work setting, that she had to get up and move around three to four times an hour, and that plaintiff's medications had been substituted in an attempt to "produce less symptomatology or relieve side effects." AR 477–483.

Pursuant to defendant's request, on April 7, 2006, Dr. Mannava performed a records review. AR 447–449. His report indicates that he reviewed a number of documents, but he did not review Dr. Schneider's December 8, 2005, report. AR 447–449. In response to defendant's request that he "[p]lease ... advise what restrictions and limitations if any are supported as of 10–31–05 and since," he stated: "Prolonged sitting more than an hour at a time and 4 to 6 hours in a day .... These limitations are supported as of 10–31–05 and since." AR 449.

On April 12, 2006, defendant's nurse reviewed Dr. Mannava's report and concluded that plaintiff had been "found to be capable of full time light restrictions and limitations without prolonged posturing sit/stand for greater than 1 hour without position change." AR 446.

By letter dated April 25, 2006, plaintiff was notified that her appeal had been denied. AR 36–40. In the denial, defendant summarized plaintiff's medical records through January, 2005, and noted that "[m]edical records document treatment with Dr. Kim beginning 02/05, and ongoing treatment with Dr. Schneider." AR 38. The letter refers to the physical capacities questionnaire forms completed by Drs. Schneider and Liceaga in January, 2005, noting that they support the ability to perform a sedentary occupation. AR 39.

---

1. Dr. Mannava criticizes this notation in Dr. Schneider's record as being unsupported by objective evidence. However, although Dr. Schneider does not support his notation in his patient's chart, his conclusion *is* supported by objective evidence in the form of findings regarding disc hemiation, physical examination that revealed tenderness, muscle spasms, lab/diagnostic test results, and plaintiff's history of surgery.

The letter answers plaintiff's criticism of defendant's reliance on Dr. Liceaga's physical capacities form by noting that Dr. Liceaga had previously reviewed plaintiff's medical records, and that his report was consistent with that of plaintiff's other physician, Dr. Schneider. AR 38. The letter further noted the medical records reviewed by Dr. Mannava, and his stated restrictions and limitations. AR 38–39. The letter noted that the restrictions provided by Dr. Liceaga in January 2005 led defendant's vocational specialist to conclude that, although plaintiff did not have the capacity to perform the material duties of her regular occupation because of her limited reaching abilities, other information in the file, most notably Dr. Mannava's report,[2] led defendant to the conclusion that she was able to perform other occupations, such as Data Entry Clerk, Receptionist, Appointment Clerk, Insurance Clerk, and Information Clerk. AR 38–39.

On August 1, 2006, the present action was filed.

## II. Evidence Outside the Administrative Record

Many debilitating side effects are associated with plaintiff's narcotic medications that are consistent with her subjective complaints, including drowsiness, dizziness, vision changes, blurred vision, weakness, light-headedness, and headaches. *See* Pltf.'s Ex. C.

Defendants do not "maintain any claim guidelines, claims memoranda, claims manual or other DOCUMENTS which discuss or pertain to side effects of narcotic medication." Pltf.'s Ex. D at 4.

## III. Standard of Review

A claims determination under an employee benefits plan governed by

ERISA is by default subject to *de novo* review. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir.1999). However, where the plan "unambiguously provide[s] discretion to [its] administrator" to interpret the terms of the plan and make final benefits determinations, the determination is reviewed for an abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir.2006).

Here, plaintiff does not argue that the plan lacks language conferring discretion upon the administrator to interpret the terms of the plan and make final benefits determinations; therefore, the Court proceeds with its analysis based on the assumption that the plan confers such discretion.

In 2006, the Ninth Circuit decided the *Abatie* case, which altered the then-existing method of determining the appropriate standard of review. Both before and after *Abatie*, the standard of review employed by a court depended on whether it appeared that the administrator's decision was influenced by a conflict of interest. *See generally Abatie*, 458 F.3d at 962–70. *Abatie* changed a complex burden-shifting test, one that *could* result in a *de novo* standard of review being employed, to a simpler one, that *always* requires an abuse of discretion standard of review when discretion is vested in the plan administrator but that, nevertheless, appears to give the district court wider discretion in reviewing administrator's decisions in most cases; now, the precise level of scrutiny a district court gives to the denial of benefits depends upon whether the administrator was operating under a conflict of interest and how much it appears to the district court that such a conflict of interest influenced the administrator's decision. *Id.* at 968. Generally, courts review a denial of benefits with

---

2. The denial letter stated: "Dr. Mannava has opined that you have the capacity for full time light work given the ability to alter positions." AR 39.

slightly greater scrutiny where, as here, the plan gives discretion to an administrator that has a so-called "structural conflict of interest" due to its status as both the claims fiduciary and the funding source of benefits. *Id.* at 965, 968–69. Other factors can greatly increase that level of scrutiny. *Id.* at 968–69.

In *Abatie*, the Ninth Circuit explained this standard at length:

> We read Firestone [*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989),] to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record. This standard applies to the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict.
>
> Our approach is substantially similar to that adopted by several other circuits .... Insofar as those cases recognize that weighing a conflict of interest as a factor in abuse of discretion review requires a case-by-case balance, we agree. A district court, when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily (that is, may cause the court to find an abuse of discretion more readily) than a minor, technical conflict might....
>
> A straightforward abuse of discretion analysis allows a court to tailor its review to all the circumstances before it.... The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompa-

nied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, ... fails adequately to investigate a claim or ask the plaintiff for necessary evidence, ... fails to credit a claimant's reliable evidence, ... or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

> We recognize that abuse of discretion review, with any "conflict ... weighed as a factor," *Firestone*, 489 U.S. at 115, 109 S.Ct. 948, 103 L.Ed.2d 80, is indefinite. We believe, however, that trial courts are familiar with the process of weighing a conflict of interest. For example, in a bench trial the court must decide how much weight to give to a witness' testimony in the face of some evidence of bias. What the district court is doing in an ERISA benefits denial case is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records. We believe that district courts are well equipped to consider the particulars of a conflict of interest, along with all the other facts and circumstances, to determine whether an abuse of discretion has occurred.

*Abatie*, 458 F.3d at 967–969 (9th Cir.2006) (paragraph structure altered, internal citations omitted).

■ Evidence not contained in the administrative record is relevant to the appropriate standard of review and may be considered by the Court in making that determination. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006).

■ Here, defendant essentially concedes that it serves in the dual role of claims fiduciary and funding source of the benefits, which creates the so-called "structural conflict of interest." *See Abatie*, 458 F.3d at 965 ("We have held that an insurer that acts as both the plan administrator and the funding source for benefits operates under what may be termed a structural conflict of interest."). Additionally, there is abundant evidence supporting a finding that the administrator's decision was greatly impacted by its conflict of interest.

First and foremost, defendant failed to investigate plaintiff's repeated complaints that the side effects of her narcotic pain medications rendered her unable to work. Plaintiff first notified defendant that her medications effected her ability to work on December 10, 2004, when she successfully appealed the termination of her benefits during the time period in which the "own occupation" clause was operative. *See* AR 118 ("Please note that I am under continuous medication which could also effect my ability to do my job."). Even after plaintiff's benefits were reinstated in February, 2005, plaintiff continued to complain about the side effects of her medications: Twice in 2005 plaintiff complained to defendant's vocational consultant that her pain medications made her "sleepy" and "fuzzy headed." Most remarkable, however, is the fact that defendant failed to address plaintiff's complaint in her *appeal letter* of November 10, 2005 (which led to the decision that is the subject of the Court's current review), in which she stated, "I am on the following medications on a daily basis, which effects my concentration of being able to focus on anything," before listing medications that included at least three narcotics.

At oral argument, defense counsel cited the Court to AR 481 as evidence that plaintiff experienced no side effects as a result of her medications. This evidence is not persuasive. Most notably, this evidence is contained in Dr. Schneider's December 8, 2005, report, and, as detailed more fully, *infra*, there is no evidence that defendant considered this report in upholding its termination of plaintiff's benefits. Rather, this argument appears to the Court to be a mere *post hoc* justification by counsel, which the Court disregards. *See Dishman v. UNUM Life Ins. Co. of America*, 269 F.3d 974, 987 (9th Cir.2001) (explicitly rejecting a "post hoc ... legally plausible justification for termination of [plaintiff's long-term disability] benefits").

Moreover, the evidence on this particular point—whether plaintiff experienced side effects from narcotic pain medication that would affect her ability to work—is not particularly probative. Under a section of a form, Dr. Schneider failed to list any particular side effects, listing only plaintiff's medications, when he was asked to "[l]ist medications prescribed, dosage, and any side effects your patient has reported." AR 481. However, Dr. Schneidner also answered "No" to the question that asked if he had "been able to completely relieve the pain with medication without unacceptable side effects," AR 480, and "Yes" to the question of whether he had "substituted medications in an attempt to produce less symptomatology or relieve side effects." AR 481. A consideration of this report leads the reader to understand plaintiff definitely takes pain medications, and that she is either experiencing pain, unacceptable side effects, or both. To the extent that defendant could not discern more precisely plaintiff's particular situation, and to the extent that defendant's efforts at reviewing plaintiff's claim for benefits were hampered by any ambiguities in the form, it would be incumbent upon defendant to seek additional information.

Here, it is clear to the Court that defendant did not investigate the extent of the debilitating side effects of plaintiff's pain medications because it understood the results of such an investigation would not have supported its denial.

Second, defendant has no claim guidelines or documents that discuss or pertain to the side effects of narcotic medication, despite the well-known debilitating effects of such medications. This fact has ramifications that go far beyond this particular claim for benefits, and provides further support for the conclusion that defendant's failure to investigate the debilitating side effects of plaintiff's pain medications because it understood the results of such an investigation would not have supported its denial.[3]

Third, defendant failed to consider the most recent report from plaintiff's treating physician, which showed plaintiff's condition to be deteriorating and set forth greater restrictions and limitations. Although defendant's trial briefs deal extensively with Dr. Schneider's December 8, 2005, decision, see Def.'s Trial Brief at 5; Def.'s Response at 5–6 (criticizing the December 8, 2005, report as inconsistent with his January, 2005 report), those briefs do not cite to any portion of the record which reveals that defendant actually considered this information in making its benefits determination.

The failure to consider this report cannot be underestimated. Importantly, it is the most recent medical report regarding plaintiff's degenerative condition,[4] and it is the most detailed medical report that addresses plaintiff's restrictions and limitations as it calls for narrative responses and seeks specific information regarding how long plaintiff can sit in an eight-hour work day. That this is the most recent medical opinion is all the more significant given plaintiff's statement in her appeal letter than her "condition has . . . gotten worse."

Moreover, of the medical reports in the record, it is the December 8, 2005, medical report that is the least supportive of the claims termination decision. Dr. Schneider's opinion that plaintiff can sit no more than two hours in an eight-hour work day, that she can stand or walk no more than one hour, and that she must get up and move around three to four times per hour is wholly inconsistent with defendant's conclusion that plaintiff can do sedentary work. Defendant failed to make even passing reference to this report.

3. The Court is not unsympathetic to the plight of insurers, who are undoubtedly wary of the potential for abuse by claimants on the issue of the debilitating effects of narcotic pain medications. Whether a claimant experiences side effects, and whether and to what extent the side effects are debilitating, can be measured only by the subjective complaints of the claimant, who has an incentive to exaggerate the effects of the medications in order to continuing receiving disability benefits. This situation is fraught with the opportunity for fraud. Admittedly, an administrator has the duty to avoid paying benefits to participants who are not entitled to receive them, and participants who exaggerate or fabricate the side effects they experience may receive benefits to which they are not entitled. However, an administrator may not guard against this fraud at the expense of participants who are left with the choice between debilitating pain (which would entitle them to benefits) and debilitating side effects of pain medications (which would also entitle them to benefits). This situation undoubtably places administrators on the horns of a dilemma. Nevertheless, whatever the solution to this dilemma may be—and the Court does not purport to have it—insurers may not simply refuse to deal with this issue by turning a blind eye to it, hoping that it will simply go away if they do not look at it.

4. As set forth more fully, infra n. 5, Dr. Mannava's April 7, 2006, report is merely a records review and does not reflect medical information after September, 2005.

Additionally, defendant failed to provide this most recent report to Dr. Mannava, who performed a medical records review.[5] Defendant relied heavily upon Dr. Mannava's report in making its claims decision, and Dr. Mannava did not have the opportunity to factor the most recent and detailed medical report into his analysis.

Fourth, the vocational report that identified the "other occupations" which plaintiff could perform and that was used in upholding the decision to deny benefits was more than a year old, rendering it of dubious value at the time of the decision. As a result, the report failed to consider the most recent restrictions and limitations. Moreover, and regardless of the issue of staleness, at its inception the report was flawed in that it failed to consider the potential debilitating side effects of plaintiff's narcotic pain medications despite plaintiff's direct complaints to the report's author regarding these side effects.

Finally, the claims denial letter to plaintiff stated that "Dr. Mannava has opined that you have the capacity for full time light work given the ability to alter positions," AR 39, when in fact Dr. Mannava drew no such conclusion, see AR 447–449; rather, it was defendant who drew this conclusion based on Dr. Mannava's stated assessment of plaintiff's restrictions and limitations. This is not too fine a point. It would be difficult for a claimant (or a lawyer, for that matter), to argue with a doctor's assessment of his or her patient's physical capacities; it is a wholly different matter for a claimant (or a lawyer) to argue that *defendant's* conclusion is unsupported by a doctor's stated restrictions and limitations.

Accordingly, the Court finds that, based on the standard set forth in *Abatie*, it must review the administrator's decision for abuse of discretion with elevated scrutiny and skepticism.

## IV. Review of the Administrator's Decision

Here, defendant paid plaintiff's benefits through October 31, 2005. She appealed that decision, and the decision to terminate her benefits was upheld for reasons set forth in a letter to plaintiff dated April 25, 2006. This is the decision subject to the Court's review.

■ The issues already discussed by the Court, *supra*, reveal that the administrator abused its discretion in the decision to deny benefits.[6] For example, defen-

---

**5.** Dr. Mannava listed a number of documents he reviewed, see AR 33–34, and Dr. Scheidner's December 8, 2005, report is not listed among them. Although Dr. Mannava stated, before setting forth his list, that the "reviewed records included but were not limited to" those listed, the level of detail of Dr. Mannava's report suggests to the Court that he was not provided with the December 8, 2005, report. Dr. Mannava discussed Dr. Scheidner's note of September 2, 2005, and compared it to Dr. Scheidner's January 7, 2005, report. AR 34. If Dr. Mannava had also reviewed Dr. Scheidner's December 8, 2005, report as well, he presumably would have discussed it as well, especially in light of the fact that Dr. Schneider's December 8, 2005, report provides the detail to support his brief notation that plaintiff was disabled from doing sedentary work September 2, 2005—a no-

tation that Dr. Mannava criticized as being "[un]document[ed][by] any objective findings."

**6.** However, mindful of the Ninth Circuit's admonition in *Abatie* that evidence outside the administrative record should be considered only in determining the appropriate standard of review, the Court's decision on the merits is limited solely to the documents in the insurer's claim file. *See Abatie*, 458 F.3d at 970 ("The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.").

dant's reliance on the January, 2005, forms is unjustified in light of the more recent December 8, 2005, report found in the record. Although defendant would have been entitled to weigh the December 8, 2005, report against the earlier records and other medical evidence on file, it did not, and the Court is left with the impression that it failed to do so because the report did not support its decision to deny benefits. By contrast, the Court finds that plaintiff suffers a degenerative condition and credits Dr. Scheidner's report because it is more recent and more detailed than the January, 2005, reports, and because it is supported by plaintiff's diagnosis and objective findings such as plaintiff's MRI results, and because there are no contemporaneous or more recent medical reports which controvert its findings. *See* AR 477, 479.

Moreover, although defendant relied heavily on its vocational consultant's report regarding plaintiff's ability to perform certain "other occupations," it failed to ask its vocational consultant to update her report based on the new medical information from plaintiff's doctor or even its own medical records reviewer.

Additionally, although defendant relied heavily upon the restrictions and limitations set forth by its reviewing doctor, it failed to have the reviewing doctor consider the most recent information—dated four months prior to his records review—that tended to support a finding of total disability. Accordingly, the Court finds the vocational reports to be of dubious evidentiary value and finds that defendant has failed to identify any "other occupations" which plaintiff can perform.

Finally, and perhaps most importantly, defendant's wholesale failure to investigate plaintiff's complaints regarding the side effects of her narcotic pain medication leaves the record wholly devoid of any evidence that controverts plaintiff's

consistent accounts of the side effects she suffers. Accordingly, the Court credits plaintiff's assessment of those effects as uncontroverted.

In the end, the Court concludes that the weight of the evidence in the administrative record firmly establishes that plaintiff is totally disabled from performing any sedentary occupation and that she is entitled to benefits under the plan effective November 1, 2005, and continuing until such time as she no longer meets the plan's definition of "totally disabled." The administrator's failure to so conclude is an abuse of discretion.

## V. Findings of Fact/Conclusions of Law

*Abatie* appears to the Court to suggest that district courts must make findings of fact in connection with the administrative review of claims decisions in ERISA cases. *See Abatie,* 458 F.3d at 973 ("[T]he district court erred by failing to make all required findings of fact. The court conducted a bench trial, but failed to make findings of fact on all contested issues.") (citing Fed. R.Civ.P. 52(a), which requires a district court to make findings of fact after bench trials). Although this decision sets forth a number of explicit factual findings, the Court sees the wisdom of making enumerated findings of fact. Accordingly, plaintiff may lodge her proposed findings of fact, consistent with this Order and with pinpoint citations to the record, with the Court no later than September 4, 2007, and defendant, if it wishes, may respond thereto no later than September 11, 2007. Plaintiff shall include an electronic version of its proposal on diskette or CD, in Word Perfect format (version X3 or lower). Plaintiff shall concurrently lodge its proposed judgment, including its calculations for pre- and post-judgment interest at the rate specified in 28 U.S.C. § 1961(a). *See Nelson v. EG & G Energy Measurements*

*Group. Inc.,* 37 F.3d 1384, 1391 (9th Cir. 1994).

## VI. Motion for Attorney Fees

■ In an ERISA action to recover unpaid disability benefits, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Where a beneficiary prevails in an ERISA suit for benefits, she "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984) (internal quotations omitted). Assuming she intends to do so, plaintiff shall file her motion for attorney fees no later than September 17, 2007.

## VII. Conclusion

As set forth herein, the Court concludes, pursuant to its review of the administrative record, that plaintiff is totally disabled from performing any sedentary occupation and that she is entitled to benefits under the plan effective November 1, 2005, and continuing until such time as she no longer meets the plan's definition of "totally disabled."

Plaintiff's proposed findings of fact and proposed judgment shall be lodged with the Court no later than September 4, 2007. Defendant's response thereto, if any, shall be filed no later than September 11, 2007.

Plaintiff's motion for attorney fees shall be filed no later than September 17, 2007.